864 P.2d 1130

**TOMORROW'S HOPE, INC.,**
Petitioner–Respondent,

v.

**IDAHO DEPARTMENT OF HEALTH AND WELFARE,** Respondent–Appellant.

No. 20121.

Supreme Court of Idaho,
Eastern Idaho, September 1993.

Dec. 7, 1993.

Larry EchoHawk, Atty. Gen., Bradford D. Goodsell, Deputy Atty. Gen., Boise, for appellant. Bradford D. Goodsell argued.

Pierce & Stoddard, Boise, for respondent. Steven M. Stoddard argued.

BISTLINE, Justice.

■ The issue presented to us for determination in this controversy is whether an administrative agency may create or amend policy without being subject to rulemaking procedures. The Administrative Procedure Act (IDAPA) in effect at times pertinent to this controversy, I.C. § 67–5201 *et seq.*, required all agency rules to be promulgated according to the procedural requirements set out in I.C. § 67–5203. The 1986 legislature amended IDAPA to exempt from the definition of a rule the interpretations of the agency relative to existing or proposed rules. I.C. § 67–5201(7) "1986 amendment."[1] We conclude that Health & Welfare's "hands-on" policy, the subject of Tomorrow's Hope's challenge, is an interpretation of an existing rule, IDAPA 16.03.-10253, which was duly promulgated by the agency and, accordingly, is enforceable against Tomorrow's Hope.

## BACKGROUND

Tomorrow's Hope, Inc., is a non-profit intermediate care facility for the mentally retarded (ICF/MR) which receives Medicaid funds under the reimbursement system administered by Health & Welfare under Title 56, Chapter 1, Idaho Code. In accordance with Title 56, Health & Welfare groups together participating facilities which offer similar services and divides their per diem costs by the number of patient days provided by the facility. Facilities are then ranked on the basis of per diem costs, and each facility's allowable costs are then reimbursed up to a "percentile cap." Certain costs are exempt from this percentile cap. Among these exemptions are certain costs "peculiar" to the care of the mentally retarded. I.C. § 56–110(a)(1).[2]

The statute states that peculiar costs are to be determined in accordance with the Provider Reimbursement Manual. I.C. § 56–110(a)(1). The manual, promulgated as a rule, accordingly provides that peculiar or "unique" costs are "direct care costs" of mentally retarded residents. IDAPA 16.03.10253. The rule then elaborates on what these costs are: direct care services required by law to be provided to ICF/MR residents, except direct physician care costs, services, and supplies which are

1. I.C. § 67–5201(7) states that "'rule' ... does not include ... intra-agency memoranda, or ... any oral or written statement given by an agency which pertains to any interpretation of an existing or proposed rule...." (APA extensively amended by Chapter 216, Idaho Session Laws, 1993).

2. Title 56, Section 110(a)(1), Idaho Code, states: [T]he director [of Health & Welfare] shall prior to ninety (90) days before the beginning of the period for which the percentile cap is being determined, add together all nonproperty, nonutility costs (administration, food, nursing services, and operations) incurred by each facility; provided that, where such facility provides care to the mentally-retarded, costs *peculiar* to such care shall first be exempted from consideration herein and shall be paid in accordance with the provider reimbursement manual, as defined in this subsection. (emphasis added).

not unique to ICF/MR patients. Subsequently, as agency auditors questioned what costs were included within the definition of direct care, Health & Welfare issued an internal memorandum construing direct care as meaning "hands-on" services only.

In its final audit for Tomorrow's Hope, Health & Welfare determined, pursuant to the policy declared in its internal memorandum, that Tomorrow's Hope's exempt costs included only hands-on costs. Tomorrow's Hope challenged this determination, arguing that the hands-on interpretation was a rule and unenforceable unless promulgated pursuant to IDAPA. At a contested administrative hearing, the hearing officer recommended that Health & Welfare's final audit determinations regarding Tomorrow's Hope's reimbursement be affirmed. Health & Welfare subsequently adopted in full the hearing officer's findings of fact, conclusions of law, and recommended decision.

On appeal, the district court reversed because it found that Health & Welfare's decision exempting only hands-on costs amounted to rulemaking which, under IDAPA, is subject to rulemaking procedures which were not followed. In determining under what circumstances a departmental change in policy amounts to rulemaking, Judge Bail relied on her interpretation of two Supreme Court decisions, *Bingham Memorial Hosp. v. Idaho Dep't. of Health & Welfare*, 112 Idaho 1094, 739 P.2d 393 (1987),[3] and *Minidoka Memorial Hosp. v. Idaho Dep't. of Health & Welfare*, 108 Idaho 344, 699 P.2d 1358 (1985),[4] which address the issue of when agency action is subject to rulemaking procedures under IDAPA. The court below thus found that Health & Welfare's denial of reimbursement for the disputed costs could not be enforced against Tomorrow's Hope, because the agency had not complied with IDAPA.

## DISCUSSION

The key question in this case is whether Health & Welfare's hands-on policy is an interpretation of the statutory term "peculiar" or of the regulatory term "direct care costs." If it is the latter, it is exempt from rulemaking requirements under I.C. § 67–5201(7) because it would be merely an interpretation of an existing rule. If, on the other hand, it is an attempt to redefine the legislative directive to exempt "peculiar" costs, Health & Welfare would be, in effect, creating a new rule without having properly promulgated it.

The trial court found that it is not the label which Health & Welfare places on the action which it takes, rather "it is the substance of what the Department has purported to do" which is decisive. Here, said the lower court, the hands-on policy actually serves to interpret the statutory language of "costs peculiar to such care" contained in I.C. § 56–110(a)(1). We do not agree that in this case Health & Welfare's hands-on definition amounted to a fundamental, significant change in interpretation of "peculiar" costs. We find that the hands-on policy is merely a refinement of, and is essentially consistent with, its earlier direct care definition.

In reaching its conclusion that Health & Welfare's action amounted to rulemaking, the district court employed principles of federal administrative law, following the analysis in *Bingham* and *Minidoka*. The court attempted to determine whether this was a "legislative" or an "interpretive" rule under the standard of the federal APA.[5] The court concluded that, regard-

---

3. In *Bingham* a unanimous Supreme Court upheld the decision of the district court that Health & Welfare's *policy* could not be enforced without a rule properly being adopted under the APA, and that the notice thereof was inadequate.

4. In *Minidoka,* the Supreme Court unanimously affirmed the rulings of the district court that Health & Welfare's policy of disallowing the county subsidy portion of a nursing home's proposed "customary charges" to patients for whom Medicaid reimbursement was sought could not be enforced without a rule properly being adopted under the APA.

5. Under the federal APA, a rule is:

[T]he whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or

less of its format, an agency interpretation which has a general and prospective effect is a legislative rule and must therefore be promulgated pursuant to the IDAPA.

■ The district court's analogy to federal law is inapposite because the 1986 amendment to IDAPA addresses this precise subject. I.C. § 67–5201(7) states:

'Rule' means any agency statement of general applicability that implements or prescribes law or interprets a statute as the statement applies to the general public. The term ... does not include ... (C) intra-agency memoranda, or ... (E) any oral or written statement given by an agency which pertains to any interpretation of an existing or proposed rule ...

The amendment intentionally uses language different from the federal APA and instead of distinguishing "legislative" from "interpretive" rules, the 1986 amendment specifically exempts from the definition of a rule inter-agency memos and interpretations of existing or proposed rules. The amendment clearly eliminates the legislative rule/interpretive rule distinction and obviates the need for analogizing to federal administrative law as a means of statutory construction.

For the same reasons, we must disagree also with the district court's reliance on *Bingham* and *Minidoka*. Although these cases were prior to the 1986 amendment, the district court reasoned that the 1986 amendment to IDAPA served to codify the results of *Bingham* and *Minidoka*. *Bingham*, 112 Idaho 1094, 739 P.2d 393, and *Minidoka*, 108 Idaho 344, 699 P.2d 1358. To the contrary, we believe that the 1986 amendment limited these cases. Had the legislature wanted to indicate its approval

of the analysis used in *Bingham* and *Minidoka*, it would have reiterated their approach by borrowing from the terminology of the federal APA as many states have done. We are persuaded that this was not its intention since it deliberately chose different language from the federal statute.

We acknowledge that the difficult problem which the 1986 amendment presents us with is determining when a purported interpretation of a rule actually amounts to a re-defining of the original statutory directive. Being unable at this point to isolate specific categories of agency interpretations which would amount to rules, we recognize that this issue will have to be determined on a case-by-case basis.

### CONCLUSION

We conclude that Health & Welfare's hands-on interpretation did not effect a substantive change in direction from the agency's existing direct care policy. Nor is it fundamentally inconsistent with the agency's earlier accounting practices. We therefore find that the hands-on policy is a clarification of the term "direct care costs." It is not an attempt to re-define "peculiar." This is, then, an interpretation of an existing rule rather than promulgation of a new rule. As such, it falls directly within the definition of what is *not* a rule under the terms of the 1986 amendment, and accordingly, is not subject to the promulgation requirements of I.C. § 67–5203.

Respondent's request for attorney fees under I.C. § 12–117 [6] is denied. Costs to appellant.

McDEVITT, C.J., and JOHNSON and TROUT, JJ. concur.

---

prescribe law or policy or describing the organization, procedure, or practice requirements of an agency ...

5 U.S.C. 551(4). Rules which fall under this definition are considered "legislative rules" and must be promulgated according to the requirements prescribed in subsection 553. "Interpretative rules" are exempt from these requirements:

[T]his subsection does not apply

(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice ...

5 U.S.C. 553(b)(3)(A).

**6.** Idaho Code § 12–117 provides:

(1) In any administrative or civil judicial proceeding involving as adverse parties a state agency and a person, the court shall award the person reasonable attorney's fees, witness fees and reasonable expenses, if the court finds in favor of the person and also finds that the state agency acted without a reasonable basis in fact or law.

SILAK, Justice, dissenting:

I must respectfully dissent from the Court's opinion because the "hands-on" interpretation represents not merely the interpretation of an existing rule but reinterprets the meaning of the statutory phrase "costs peculiar to such care [for the mentally-retarded]", I.C. § 56–110(a)(1). Accordingly, the decision of the hearing examiner should be reversed and the district court affirmed because the Idaho Department of Health and Welfare (Department) acted without first promulgating a rule as required by the Idaho Administrative Procedure Act (IDAPA), I.C. § 67–5201 *et seq.*

The Provider Reimbursement Manual (PRM) interpreted the statutory term "peculiar" costs by using the similar term "unique". The provision at issue must be read in its entirety and is therefore set forth in the margin.[7] The introductory statement makes clear that costs unique to the care of ICF/MR residents "are limited to direct care costs ..." Section 01. then specifies what is meant by "direct care costs" both by a process of inclusion and exclusion. Included within direct care costs are "costs of direct care services required by state and federal regulations to be provided to ICF/MR residents ..." For a complete understanding of what is included in the definition of direct care costs, reference must be made to other state and federal regulations, as elaborated below. The excluded services are: (a) direct physician care costs; (b) costs for such items as eyeglasses, hearing aids, and dental services, which are covered under a different portion of the Medicaid Program; and (c) costs of services covered by other parts of the Medicaid Program, such as drugs and ambulance transportation.

The "Rules and Regulations Governing ICF/MR's," at 16 IDAPA 02.17270.03, set forth the nursing services which must be provided to the mentally retarded living in an ICF. Such services must include, among others:

1. Providing contact with a resident's responsible physician in the event of an unanticipated health related condition and to coordinate follow-up care;

2. Nurse participation in preadmission evaluation study and plan; evaluation study, program design, and placement of the resident at the time of admission to the facility;

3. Periodic reevaluation of the type, extent, and quality of services and programming;

4. The development of discharge plans; and

5. The control of communicable diseases and infections through identification, assessment, reporting to medical authorities and implementation appropriate protective and preventative measures.

> Idaho Department of Health and Welfare Rules and Regulations, Title 3, Chapter 9, "Rules Governing Medical Assistance Manual", and include such items and services as eyeglasses, hearing aids, and dental services provided to Medicaid recipients under the age of twenty-one (21). The cost of the services is not includable as a part of nursing home costs. Reimbursement can be made to a professional providing these services through his billing the Medicaid Program on his own provider number.
>
> c. Costs of services covered by other parts of the Medicaid Program. Examples of these items include legend drugs and ambulance transportation. These items must be billed to the Medicaid Program direct by the provider on his own provider number.
>
> Provider Reimbursement Manual (PRM), 16 IDAPA 03.10000 *et seq.,* 10253.

7. PATIENT CARE COSTS UNIQUE TO THE CARE OF ICF/MR RESIDENTS. This cost is limited to direct care costs of ICF/MR residents. No administration [,] dietary, food, laundry, housekeeping or maintenance costs are to be reported in this cost area.
01. *Direct Care Services.* Costs of services to be included in this cost area would typically include costs of direct care services required by state and federal regulations to be provided to ICF/MR residents with the following exceptions:
a. Direct physician care costs. These costs are not includable as part of the nursing home costs. Physicians providing these services must bill the Medicaid Program direct on their own provider number.
b. Costs of services covered under the Early and Periodic Screening Diagnosis and Treatment (EPSDT) portion of the Medicaid Program. These services are enumerated in

These provisions were adopted in 1980 and thus predated the adoption of the "Patient Care Costs Unique to the Care of ICF/MR Residents" provision of the PRM, quoted above. *See* 16 IDAPA 02.17270.03, subsections (b) and (c). As noted, federal regulations were incorporated by reference into the definition of "direct care services." These are found at 42 C.F.R. § 442.478 and provide for a substantially similar character of nursing services as detailed above.

The "hands-on" policy in the Department's internal memorandum at issue reads in pertinent part as follows:

> Direct care costs mean all costs for RNs, LPNs, Aides and Orderlies, contracted and professional services for "hands-on patient care [as opposed to services for the general benefit of the facility] ...

At the administrative hearing in this case, the Department's auditor testified that the nursing care which he would consider "hands-on" would mean that "the nurse would be in direct contact with the patient." He excluded from the definition of "hands-on" activities by a nurse such as making out a report, calling a physician, and talking with one of the other staff members on developing a plan. The auditor testified that he removed certain nursing costs from the unique to the capped category based on his understanding of the hands-on policy.

The hands-on policy, as explained and applied by the auditor, removes from the definition of direct care services certain nursing services pertaining to patient care planning, reporting, and interaction with physicians, required by the state and federal regulations set forth above. The hands-on policy thus works a substantial change on the direct care services provision of the PRM. That provision originally had broadly included *all* costs of direct care services required by state and federal regulations, except for the three specifically enumerated categories.[8] The hands-on policy should appropriately have been included as the fourth exception to the broad definition of direct care services, assuming this could have been done without running afoul of other state and federal regulations. The hands-on policy has become a part of the exclusions and inclusions which make up the definition of "patient care costs unique to the care of ICF/MR residents," the agency "statement of general applicability that implements or prescribes law or interprets a statute as the statement applies to the general public." I.C. § 67–5201(7). It is thus a "rule" which should have been promulgated in accordance with the IDAPA.

---

**8.** An amendment to an existing agency rule is also considered a rule. I.C. § 67–5201(7): "rule" ... includes the amendment or repeal of a prior rule....