69 P.3d 139

ASARCO INCORPORATED, Coeur Silver Valley, Inc., and Hecla Mining Company, Plaintiffs–Respondents,

v.

STATE of Idaho, Idaho Department of Environmental Quality, Director of the Department of Environmental Quality and Idaho Board Of Environmental Quality, Defendants–Appellants.

No. 27914.

Supreme Court of Idaho, Boise, February 2003 Term.

April 25, 2003.

Hon. Lawrence G. Wasden, Attorney General, Boise, for appellants. Darrell G. Early, Deputy Attorney General, argued.

Hull, Branstetter & Simpson, Wallace, for respondent ASARCO. Timothy H. Butler argued.

Barker Rosholt & Simpson, LLP, Boise, for respondent Hecla Mining. Albert P. Barker argued.

William F. Boyd, Coeur d'Alene, for respondent Coeur Silver Valley.

TROUT, Chief Justice.

This is a state administrative law case involving issues specific to the federal Clean Water Act. The Idaho Department of Environmental Quality (DEQ) appeals from a district court order invalidating the Total Maximum Daily Load (TMDL) DEQ developed for lead, zinc, and cadmium in the Coeur d'Alene River Basin.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

Pursuant to the federal Clean Water Act and the Idaho Water Quality Act, DEQ is required to take several steps in order to improve water quality in the state of Idaho. The first step requires development of state water quality standards. These water quality standards are specific to each water body and are based on the designated uses of the water. 33 U.S.C. § 1313(c)(2)(A); I.C. §§ 39–3603 and 3604. The second step requires DEQ to identify those water bodies that fail to meet the state water quality standards. 33 U.S.C. § 1313(d)(1)(A); I.C. § 39–3609. This list is also referred to as the 303(d) list or water quality limited seg-

ments (WQLS) list. The third step requires DEQ to establish TMDL figures for each water quality limited segment. 33 U.S.C. § 1313(d)(1)(C)[1]; I.C. § 39–3611. Once the TMDL's are established for each of the segments, they are incorporated into the state's water quality management plan. 33 U.S.C. § 1313(e); I.C. § 39–3612. The purpose of this process is to identify segments of water bodies in Idaho that do not meet the state's water quality standards and, through the TMDL, establish the maximum amount of pollution that can go into those segments from both point and nonpoint sources in an effort to reduce the pollutants and ultimately improve the quality of the water receiving the pollution.[2]

Under the Clean Water Act, the states have primary responsibility for the water-quality based program; however, EPA must approve the states' actions, including the development of water quality standards, 303(d) lists, and TMDL's. 33 U.S.C. §§ 1313(a)(3), (d)(2). Further, if the EPA disapproves of a state's actions or the state fails to act, then the EPA must complete the required state action. *See e.g. Alaska Center for the Environment v. Browner*, 20 F.3d 981, 983 (9th Cir.1994); *Idaho Sportsmen's Coalition v. Browner*, 951 F.Supp. 962, 964 (W.D.Wash. 1996).

In this case, DEQ and EPA worked together to establish the TMDL for the Coeur D'Alene River Basin. While DEQ provided some notice to interested parties and took some testimony regarding the establishment of the TMDL, the parties concede DEQ did not follow the procedures set out in the Idaho Administrative Procedures Act (IAPA) for rulemaking. Nevertheless, after the TMDL was established for the Coeur d'Alene

---

1. 33 U.S.C. § 1313(d)(1)(C) provides:

   Each State shall establish for the waters identified in paragraph (1)(A) of this subsection, and in accordance with the priority ranking, the total maximum daily load, for those pollutants which the Administrator identifies under section 1314(a)(2) of this title as suitable for such calculation. Such load shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the

relationship between effluent limitations and water quality.

2. Point sources are discernible and confined conveyances, including pipes, ditches, channels, conduits, discrete fissures and containers. I.C. § 39–3602(18). Nonpoint sources refer to a variety of activities that result in water pollution, including grazing, crop production, recreation, or runoff from storms and other weather related events. I.C. § 39–3602(14).

River Basin, the EPA considered the TMDL to be binding and enforced the TMDL through the National Pollutant Discharge Elimination System (NPDES) process.

On September 8, 2000, Asarco Incorporated, Coeur Silver Valley, Inc., and Hecla Mining Company (collectively, the Mining Companies) filed a petition for judicial review and for declaratory judgment claiming the TMDL was void for failure to comply with the formal rulemaking requirements under the IAPA. DEQ responded by filing a motion to dismiss, arguing the court lacked subject matter jurisdiction over the case because the Mining Companies had failed to exhaust their administrative remedies. The Mining Companies opposed the motion and then filed a motion for summary judgment. On May 31, 2001, DEQ filed a cross motion for summary judgment. After a hearing, the district judge resolved the dispute in favor of the Mining Companies holding (1) DEQ should have followed formal rulemaking requirements under the IAPA when establishing the TMDL for the Coeur d'Alene River Basin; therefore, (2) the Mining Companies contesting the TMDL need not exhaust their administrative remedies prior to seeking judicial review and (3) the TMDL is void for failure to comply with statutory guidelines. DEQ has now appealed that decision.

## II.

### STANDARD OF REVIEW

■ This Court's review of a trial court's ruling on a motion for summary judgment is the same standard used by the trial court in originally ruling on the motion. *Sun Valley v. Rosholt, Robertson & Tucker*, 133 Idaho 1, 3, 981 P.2d 236, 238 (1999)(citing *Friel v. Boise City Hous. Auth.*, 126 Idaho 484, 887 P.2d 29 (1994)). Pursuant to I.R.C.P. 56(c), summary judgment must be entered when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." This Court liberally construes the record in favor of the party opposing the motion for summary judgment and draws any reasonable inferences and conclusions in that party's favor. *Id.* at 4, 981 P.2d at 239 (citing *Farm Credit Bank of Spokane v. Stevenson*, 125 Idaho 270, 869 P.2d 1365 (1994)). If the evidence reveals no disputed issues of material fact, what remains is a question of law, over which this Court exercises free review. *Farm Credit Bank of Spokane*, 125 Idaho at 272, 869 P.2d at 1367.

## III.

### DISCUSSION

■ The district judge correctly determined the TMDL is a rule and, therefore, was also correct in holding it was unnecessary for the Mining Companies to exhaust their administrative remedies prior to seeking a declaratory judgment in district court and the TMDL is void for failure to comply with statutory guidelines. TMDL's establish the maximum amount of a pollutant a waterbody can handle without violating the state's water quality standards. *San Francisco BayKeeper v. Whitman*, 297 F.3d 877, 880 (9th Cir.2002). In contrast to the NPDES permitting system, which focuses on individual point source dischargers, the TMDL calculation considers the water quality of the receiving waterbody and the cumulative impacts of multiple sources of pollution. *See* I.C. § 39–3602(27); 40 CFR 130.2(i). Thus, the TMDL calculations "help ensure that the cumulative impacts of multiple point source discharges are accounted for, and are evaluated in conjunction with pollution from other nonpoint sources." *Alaska Center for the Environment v. Browner*, 20 F.3d at 983. In Idaho, the process for developing TMDL's is prescribed by state law in the Idaho Water Quality Act.

### A. The District Judge Correctly Determined the TMDL is a Rule.

■ On appeal, DEQ argues the trial court erred in determining the TMDL was a rule for two reasons. First, it argues the TMDL does not implement or interpret existing law in the manner of a rule. Rather, the TMDL is an unenforceable planning tool analogous to a comprehensive plan; the TMDL does not prescribe a new enforceable

standard; and the TMDL does not have the force and effect of law. Second, DEQ argues it exercised its discretion and purposefully chose not to engage in rulemaking in order to render the TMDL unenforceable.

■ As a preliminary matter, contrary to DEQ's arguments, an agency action is not a rule because it was promulgated according to rulemaking authority and has the force and effect of law. Rather, an agency action characterized as a rule must be promulgated according to statutory directives for rulemaking in order to have the force and effect of law. *See* I.C. § 67–5231 (declaring rules void unless adopted in substantial compliance with the requirements of the IAPA); *Mead v. Arnell,* 117 Idaho 660, 664, 791 P.2d 410, 414 (1989) (holding rules promulgated by agency action have the force and effect of law). *See also Minidoka Memorial Hospital v. Idaho Department of Health and Welfare,* 108 Idaho 344, 699 P.2d 1358 (1985) (holding state policy, implemented as a rule without being promulgated as a rule, was unenforceable) and *Bingham Memorial Hospital v. Idaho Department of Health and Welfare,* 108 Idaho 346, 699 P.2d 1360 (1985) (same). Furthermore, even if DEQ has the discretion under the Clean Water Act to determine whether or not the TMDL will have the force and effect of law in Idaho, under Idaho administrative law, the TMDL is still a rule and must be promulgated in accordance with the IAPA in order to be valid.

Under Idaho administrative law, a rule is defined as "[t]he whole or part of an agency statement of general applicability that has been promulgated in compliance with the provisions of this Chapter that implements, interprets, or prescribes (a) law or policy; or (b) the procedure or practice requirements of an agency." I.C. § 67–5201(19). The statute specifically exempts the following actions from this definition:

[1] statements concerning only the internal management or internal personnel policies of an agency and not affecting private rights of the public or procedures available to the public;

[2] declaratory rulings issued pursuant to section 67–5232, Idaho Code; or

[3] intra-agency memoranda; or

[4] any written statements given by an agency which pertain to an interpretation of a rule or to the documentation of compliance with a rule.

I.C. § 67–5201(19)(b).

■ Thus, under the statutory definition, an agency action is a rule if it (1) is a statement of general applicability and (2) implements, interprets, or prescribes existing law. *See also, Tomorrow's Hope, Inc. v. Idaho Department of Health and Welfare,* 124 Idaho 843, 846, 864 P.2d 1130, 1133 (1993). Nonetheless, this definition of a rule is too broad to be workable. · Under such a definition, virtually every agency action would constitute a rule requiring rulemaking procedures. Therefore, in order to provide further guidance in determining when agency action requires rulemaking, this Court adopts the reasoning of the district court and considers the following characteristics of agency action indicative of a rule: (1) wide coverage, (2) applied generally and uniformly, (3) operates only in future cases, (4) prescribes a legal standard or directive not otherwise provided by the enabling statute, (5) expresses agency policy not previously expressed, and (6) is an interpretation of law or general policy. *See Woodland Private Study Group v. State of New Jersey,* 109 N.J. 62, 533 A.2d 387 (1987). The district court correctly applied these factors to the facts, ultimately holding the TMDL constitutes a rule requiring rulemaking in order to be valid.

*1. The TMDL has wide coverage.* The TMDL applies to all current and future dischargers in a specific water body, in this case, the Coeur d'Alene River Basin. Thus, the TMDL is accurately described by the trial court as applying to "a large segment of the general public rather than an individual or narrow select group."

*2. The TMDL is applied generally and uniformly.* While the TMDL has characteristics that are both generally applicable and discharger specific, the TMDL, on the whole, is more appropriately described as generally applicable.

The TMDL, in part, constitutes a numerical limit or budget for a given water body, based on the sum of the allowable pollution

from all identified point source and nonpoint sources of pollution, as well as natural background levels of the pollutant. I.C. § 39-3602(27); 40 CFR 130.2(i). These sums are based on individual determinations, referred to as load allocations (LA's) and wasteload allocations (WLA's). LA's are defined as the "portion of a receiving water's loading capacity that is attributed either to one of its existing or future nonpoint sources of pollution or to natural background sources." 40 CFR 130.2(g). The wasteload allocations (WLA's) represent the "portion of a receiving water's loading capacity that is allocated to one of its existing or future point sources of pollution." 40 CFR 130.2(h). The federal regulations further describe the WLA's as "a type of water-quality based effluent limitation." *Id.* In addition, the EPA has used these individualized load allocations as enforceable limits modifying the Mining Companies' NPDES permits accordingly. Thus, focusing on the LA and WLA determinations alone, the TMDL process appears to be discharger specific.

Nevertheless, the individual LA and WLA determinations are just a small part of the entire TMDL process. First, the TMDL considers the LA and WLA allocations in sum in order to determine an over-all effluent limitation budget for the identified water body. This budget applies to all existing and future point and nonpoint source dischargers in a general and uniform manner. Second, the TMDL process outlined by Idaho statute includes the following additional qualitative and quantitative determinations:

(1) Identification of pollutants impacting the water body;

(2) An inventory of all point and nonpoint sources of the identified pollutant . . .;

(3) An analysis of why current control strategies are not effective in assuring full support of designated beneficial uses;

(4) A plan to monitor and evaluate progress toward water quality progress and to ascertain when designated beneficial uses will be fully supported;

(5) Pollution control strategies for both nonpoint and point sources for reducing those sources of pollution;

(6) Identification of the period of time necessary to achieve full support of designated beneficial uses; and

(7) An adequate margin of safety to account for uncertainty.

I.C. § 39-3611. Clearly these procedures are generally and uniformly applicable and require DEQ to focus on the waterbody as a whole, as opposed to the individual sources of pollution. Therefore, for the above reasons, even though the TMDL involves determinations of specific applicability, the over-all scheme demonstrates the TMDL is more appropriately described as generally and uniformly applicable.

3. *The TMDL Operates Only in Future Cases.* The TMDL operates only prospectively and does not adjudicate past actions by the Mining Companies or any other party.

4. *The TMDL Prescribes a Legal Standard Not Provided by the Enabling Statute.* As described above, the TMDL constitutes a numerical limit on the total allowable discharge in a specified waterbody. This limit is allocated between point sources and nonpoint sources of pollution. Even if DEQ does not intend to enforce these limitations, and this Court is not determining whether or not it may properly do so, EPA considers these numbers binding and has already used the TMDL in order to reduce the discharge limits reflected in several of the Mining Companies' NPDES permits. Thus, the TMDL in fact contains quantitative legal standards not provided by either the Clean Water Act or the Idaho Water Quality Act.

5. *The TMDL Expresses New Agency Policy.* Even if the TMDL is nothing more than a planning tool, as DEQ argues, it is an expression of agency policy not previously addressed. This is true not only of the numerical limits contained in the TMDL, but also the additional requirements contained in the Idaho Water Quality Act, including (1) the analysis of why current control strategies are not effective in assuring full support of designated beneficial uses; (2) the plan to monitor and evaluate progress toward water quality progress and to ascertain when designated beneficial uses will be fully supported; and (3) the identification of pollution control strategies for both nonpoint and point

sources for reducing those sources of pollution. I.C. § 39–3611.

6. *The TMDL Implements and Interprets Existing Law.* While DEQ argues the TMDL implements the water quality standards, which constitute a rule as opposed to a law, the TMDL actually implements and interprets the directives contained in both the Clean Water Act, as well as the more specific Idaho Water Quality Act.

The central problem with DEQ's argument is the state water quality standards do not provide all of the information or direction necessary for promulgating a TMDL. While the water quality standards serve as a basis for the TMDL calculations, the TMDL requires much more. Under the Idaho Water Quality Act, not only must DEQ identify the pollutants and inventory point and nonpoint sources of pollution, the agency must also analyze why current control strategies are not effective and develop new pollution control strategies for point and nonpoint sources of pollution. I.C. § 39–3611. In addition, the Idaho Water Quality Act requires DEQ to allocate effluent limitations among point and nonpoint sources of pollution and develop planning processes to monitor and evaluate progress. *Id.* In making these types of decisions, DEQ is working far outside the scope of the water quality standards alone and is both implementing law and creating policy. Thus, DEQ's argument that the TMDL implements a rule as opposed to a law is unpersuasive.

■ In conclusion, the district court correctly determined the establishment of the TMDL involved "rulemaking." Furthermore, because the TMDL is properly considered a rule, it is invalid pursuant to the IAPA.

The IAPA provides, "[a] temporary or final rule adopted and becoming effective after July 1, 1993, is voidable unless adopted in substantial compliance with the requirements of this chapter." I.C. § 67–5231. It is undisputed that DEQ did not comply with formal rulemaking requirements. Rather than arguing it had substantially complied with the rulemaking requirements, DEQ argued it did not have to do so. Thus, the district court correctly held the TMDL is void for failure to comply with state administrative law.

**B. The District Court Correctly Determined the Mining Companies Did Not Have to Exhaust Their Administrative Remedies Prior to Seeking Judicial Review.**

■ While the general rule is that a contestant must first exhaust administrative remedies before filing a complaint in district court, there is an exception for declaratory judgments regarding agency rules. The IAPA provides:

> The validity or applicability of a rule may be determined in an action for declaratory judgment in the district court, if it is alleged that the rule, or its threatened application interferes with or impairs, or threatens to interfere with or impair, the legal rights of the petitioner ... a declaratory judgment may be rendered whether or not the petitioner has requested the agency to pass upon the validity or applicability of the rule in question.

I.C. §§ 67–5278(1), (3).

The Mining Companies sought a declaratory judgment from the state district court regarding the validity of the TMDL as a rule. Further, it is undisputed that at least two of the Mining Companies' NPDES permits were modified by EPA as a result of the TMDL causing the Mining Companies to decrease their effluent limitations at a cost. Therefore, the district court correctly concluded the Mining Companies were permitted to seek judicial review prior to exhausting their administrative remedies.

**IV.**

**CONCLUSION**

Because the TMDL clearly meets the definition of a rule under the IAPA, the Mining Companies appropriately sought immediate review in the district court and the district court correctly determined the TMDL was void, since it was not promulgated according to rulemaking requirements under the IAPA.

We award costs on appeal to the Mining Companies.

Justices SCHROEDER, WALTERS, KIDWELL and EISMANN, CONCUR.