FAIRFIELD COUNTY BOARD OF COMMISSIONERS,
APPELLANT, *v.* NALLY, DIR., APPELLEE.

[Cite as *Fairfield Cty. Bd. of Commrs. v. Nally,*
143 Ohio St.3d 93, 2015-Ohio-991.]

(No. 2013–1085—Submitted June 25, 2014—Decided March 24, 2015.)

LANZINGER, J.

## I. Introduction

{¶ 1} This environmental case challenges the procedure used by the Ohio Environmental Protection Agency ("Ohio EPA") in issuing a renewed water-discharge permit to the Tussing Road Water Reclamation Facility in Fairfield County (the "Tussing Road plant"). The wastewater-treatment plant, because it discharges certain substances into Blacklick Creek, is required to obtain a National Pollutant Discharge Elimination System ("NPDES") permit from Ohio EPA under the Federal Water Pollution Control Act, 33 U.S.C. 1251 et seq. ("the Clean Water Act"). *See* 33 U.S.C. 1342(a); R.C. 6111.03.

{¶ 2} Appellant, the Fairfield County Board of Commissioners ("the county"), challenges the validity of new phosphorus limitations added on June 30, 2006, to the Tussing Road plant's renewed NPDES permit. The county alleges that Ohio EPA ignored the administrative rulemaking procedures required by R.C. Chapter 119 and imposed the new limits solely on the approval by the United States Environmental Protection Agency ("U.S. EPA") of a total maximum daily load ("TMDL")[1] established for the watershed in question. The county contends that it should have had a full and fair opportunity to be heard and the right to review and challenge the TMDL before it was submitted to U.S. EPA. Ohio EPA, on the other hand, maintains that a TMDL is not subject to state rulemaking requirements because it is not a rule. Ohio EPA argues that a party already has an adequate opportunity to challenge the application of pollutant limitations before an NPDES permit is issued.

{¶ 3} We agree with the county's position. And although we affirm the judgment of the court of appeals that vacated the NPDES phosphorus limitations, we do so for different reasons. A TMDL established by Ohio EPA pursuant to the Clean Water Act is a rule that is subject to the requirements of R.C. Chapter 119, the Ohio Administrative Procedure Act. Such a rule must be properly promulgated by the state before it is submitted for approval to U.S. EPA. We hold that Ohio EPA must follow the procedures in R.C. Chapter 119 before the TMDL may be implemented in an NPDES permit.

## II. Case Procedure

{¶ 4} Fairfield County owns and operates its Tussing Road wastewater-treatment plant in Pickerington, Ohio, near Blacklick Creek. The plant discharg-

---

1. Briefly defined, a TMDL is "a calculation of the maximum amount of a pollutant that a waterbody can receive and still meet water quality standards." http://water.epa.gov/lawsregs/lawsguidance/cwa/tmdl/overviewoftmdl.cfm.

es treated wastewater into Blacklick Creek pursuant to an NPDES permit, which is required for "point sources."[2] *See generally* R.C. 6111.04.

{¶ 5} The county applied for renewal of the NPDES permit for the Tussing Road plant on Blacklick Creek, and a renewal was issued on June 30, 2006. The renewed permit contained a new condition limiting the discharge of phosphorus. In imposing this new limit, Ohio EPA relied on its August 19, 2005 report titled "Total Maximum Daily Loads for the Big Walnut Creek Watershed" ("the TMDL report"), available, minus the appendices, at http://www.epa.state.oh.us/portals/35/tmdl/BWC_Final% 20081505.pdf (accessed Mar. 12, 2015).

{¶ 6} The county filed a notice of appeal with the Environmental Review Appeals Commission ("ERAC"), arguing, among other things, that the phosphorus limitation in the Tussing Road NPDES permit was unlawful and unreasonable.

{¶ 7} After a hearing held from February 9 to 13, 2009, ERAC determined that Ohio EPA had a valid foundation for imposing the phosphorus limit in the renewed NPDES permit. 2011 WL 1841913 (May 12, 2011). But ERAC determined that the agency had violated R.C. 6111.03(J)(3) by failing to consider whether the permit limits on phosphorus were technologically feasible and economically reasonable. *Id.* at ¶ 88–89. ERAC vacated the phosphorus limit contained in the NPDES permit and remanded the case to Ohio EPA for further consideration.

{¶ 8} The county appealed ERAC's conclusion that Ohio EPA had a valid foundation for imposing the phosphorus limit. Ohio EPA cross-appealed, arguing that the TMDL had been federally approved and that Ohio EPA is required by law to set a limit that is consistent with that approved limit.

{¶ 9} The Tenth District Court of Appeals affirmed ERAC's order, stating that the TMDL provided a "sufficient factual foundation for the phosphorus limitation" in the permit, that it constituted reliable, probative, and substantial evidence to support the order, and that it was developed in accordance with state and federal law. 2013-Ohio-2106, 2013 WL 2422905, at ¶ 66. The court of appeals also rejected the county's argument that NPDES permit limitations are not subject to meaningful review and therefore violate due process. *Id.* at ¶ 77–80.

---

2.   Ohio Adm.Code 3745–33–01(AA) defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." Ohio Adm.Code 3745–33–01(V) defines "nonpoint source" as "any source of pollutants other than those defined or designated as point sources."

{¶ 10} The county appealed to this court, and we agreed to decide three propositions of law: (1) whether a TMDL is a "rule" that must be promulgated under Ohio law before it can be the basis of an NPDES permit limit, (2) whether Ohio EPA's duty to provide a factual foundation for the permit limit is satisfied solely by reliance on a TMDL approved by U.S. EPA, and (3) whether ERAC's failure to consider evidence opposing the limit unconstitutionally insulates the TMDL from a meaningful review and denies the challenging party its right to due process of law.  137 Ohio St.3d 1469, 2014-Ohio-105, 1 N.E.3d 433.

*Issues Summarized*

{¶ 11} To summarize, we must determine whether the TMDL is a "rule" that requires Ohio EPA to undergo R.C. Chapter 119 rulemaking and whether the procedures used instead by the agency and approved by the Tenth District prevented the county from obtaining due process.

{¶ 12} A brief look at the underlying statutes and regulations is in order.

### III.   Statutory Overview and Relevant Definitions

*Ohio's Obligations under the Clean Water Act*

{¶ 13} The Federal Water Pollution Control Act, codified at 33 U.S.C. 1251 et seq., also known as the Clean Water Act, is the federal law designed to control and abate water pollution.  Ohio EPA has been authorized to develop appropriate environmental protections for the state in furtherance of the Clean Water Act's objective "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. 1251(a); *see* R.C. 3745.01 (creating the agency to "administer laws pertaining to * * * the prevention, control, and abatement of * * * water pollution").  The Clean Water Act seeks to achieve these goals through the use of two methods: (1) technology-based effluent limitations on "point sources" from which pollutants are discharged, which may require equipment and process changes for the point source, *see* 33 U.S.C. 1311, and (2) water-quality standards, which classify a body of water by its designated use and set criteria for protecting that use, *see* 33 U.S.C. 1313.

{¶ 14} Section 303(d)(1)(A) of the Clean Water Act requires that every state identify those waters within its boundaries for which the required effluent limitations "are not stringent enough to implement any water quality standards applicable to such waters." 33 U.S.C. 1313(d)(1)(A).  The state must rank these impaired waterways based on the severity of the pollution and the use of the waters.  *Id.* Based on this ranking, the state must develop a TMDL "for those pollutants which [U.S. EPA] identifies under section 1314(a)(2) of this title as suitable for such calculation." 33 U.S.C. 1313(d)(1)(C).  U.S. EPA determined that all pollutants are suitable for TMDL calculation.  43 Fed.Reg. 60,662; *Virginia Dept. of Transp. v. U.S. Environmental Protection Agency*, E.D.Va. No.

1:12–CV–775, 2013 WL 53741, *1 (Jan. 13, 2013). The TMDL sets the maximum amount of a pollutant that may be discharged without causing the receiving body of water to violate water-quality standards. 33 U.S.C. 1313(d)(1)(C).

{¶ 15} The state then is required to submit each TMDL to U.S. EPA for its approval. 33 U.S.C. 1313(d)(2). U.S. EPA must approve or disapprove a state's TMDL within 30 days of submission. *Id.* If U.S. EPA disapproves of any TMDL, it has 30 days from the date of disapproval to establish a new TMDL. *Id.*

{¶ 16} Once a TMDL is federally approved, the state shall incorporate it. 33 U.S.C. 1313(d) and (e). Any NPDES permit must include limits that are "consistent with the assumptions and requirements" set forth in the TMDL. 40 C.F.R. 122.44(d)(1)(vii)(B). The goal is for each state to establish limitations on pollutants in order to implement applicable water-quality standards and restore those waterways that have been identified as impaired. Developing the TMDL of pollutants for each such waterway in the state is one way of accomplishing those goals.

*The Total Maximum Daily Load*

{¶ 17} Just as many other environmental concepts do, a TMDL has a technical definition:

> Total maximum daily load (TMDL). The sum of the individual WLAs [wasteload allocations] for point sources and LAs [load allocations] for nonpoint sources and natural background. If a receiving water has only one point source discharger, the TMDL is the sum of that point source WLA plus the LAs for any nonpoint sources of pollution and natural background sources, tributaries, or adjacent segments. TMDLs can be expressed in terms of either mass per time, toxicity, or other appropriate measure. If Best Management Practices (BMPs) or other nonpoint source pollution controls make more stringent load allocations practicable, then wasteload allocations can be made less stringent. Thus, the TMDL process provides for nonpoint source control tradeoffs.

40 C.F.R. 130.2(i).

{¶ 18} As defined more clearly in the TMDL report, a TMDL focuses on the water body and is "a calculation of the maximum amount of a pollutant that a waterbody can receive and still meet water quality standards, and an allocation of that amount to the pollutant's sources." *Id.* at 1.

{¶ 19} As of May 9, 2013, Ohio EPA had listed approximately 86 water bodies for TMDL development, approximately one-half of which have been completed and approved by U.S. EPA, with the remaining in various stages of development.

(A map of Ohio showing the stage of TMDL development across the state may be downloaded from Ohio EPA's TMDL website, http://epa.ohio.gov/dsw/tmdl/index. aspx (accessed Mar. 12, 2015).)

*Big Walnut Creek TMDL*

{¶ 20} Establishing a TMDL involves consideration of numerous factors, including the type of water body at issue, the pollutant sources contributing to water quality, and the types of pollutants involved. *See generally* Ohio Adm.Code 3745–2–12. Development of the TMDL for Big Walnut Creek Basin began with an Ohio EPA study in 2000 with a stream survey of Blacklick Creek, which is one of 54 "stream segments" in the Big Walnut Creek watershed. As part of the survey, Ohio EPA collected biological and chemical data from upstream and downstream of the Tussing Road plant. Based on the results of the survey, Ohio EPA concluded that the Tussing Road plant was contributing to organic and nutrient enrichment in Blacklick Creek, a negative environmental situation.[3] According to Ohio EPA, this eventually required a new phosphorus limitation to be added for the Tussing Road plant's NPDES permit.

{¶ 21} The agency argues that it engaged in a lengthy process to develop the Big Walnut Creek watershed TMDL. Ohio EPA collected data and information to assess impairments in the quality of the watershed and identify possible causes and sources of those impairments. One type of impairment is nutrient enrichment, which causes nuisance growths of aquatic weeds and algae. Excessive concentrations of phosphorus contribute to nutrient enrichment. The TMDL report found that nutrient enrichment was a primary cause of impairment in the Big Walnut Creek watershed. To address that issue, the report established a phosphorus discharge limit for various sources, including the Tussing Road plant.

{¶ 22} Ohio EPA relies on the outcome of its process, the TMDL report, a lengthy document containing data and analyses, graphs and charts, assumptions, and policy choices. The agency denies that the TMDL itself is a rule, calling it simply guidance. We have emphasized that " '[i]t is the effect of the [document], not how the [agency] chooses to characterize it, that is important' " in determining whether a document qualifies as a rule. (Brackets sic.) *State ex rel. Saunders v. Indus. Comm.*, 101 Ohio St.3d 125, 2004-Ohio-339, 802 N.E.2d 650,

---

3. "Elevated concentrations of nutrients can lead to excessive, often unsightly, growth of aquatic plants. Overgrowth of aquatic plants can clog water-intake pipes and filters and can interfere with recreational activities, such as fishing, swimming, and boating. Subsequent decay of aquatic plants can result in foul odors and taste." *New Studies Initiated by the U.S. Geological Survey—Effects of Nutrient Enrichment on Stream Ecosystems* 1 (Dec. 2003), available at http://pubs.usgs.gov/fs/fs 11803/ (accessed Mar. 12, 2015).

¶ 26, quoting *Ohio Nurses Assn., Inc. v. Ohio State Bd. of Nursing Edn. & Nurse Registration,* 44 Ohio St.3d 73, 76, 540 N.E.2d 1354 (1989).

{¶ 23} We now consider whether the TMDL is a rule.

## IV. Legal Analysis

*Characterization of the TMDL: Is It a Rule?*

{¶ 24} In relying on federal approval of the TMDL to affirm ERAC's order, the Tenth District Court of Appeals considered the argument that the TMDL was a rule requiring formal promulgation under R.C. Chapter 119 and dismissed it in a few sentences. 2013-Ohio-2106, 2013 WL 2422905, ¶ 76.

{¶ 25} R.C. 119.02 broadly states:

> Every agency authorized by law to adopt, amend, or rescind rules shall comply with the procedure prescribed in sections 119.01 to 119.13, inclusive, of the Revised Code, for the adoption, amendment, or rescission of rules. Unless otherwise specifically provided by law, the failure of any agency to comply with such procedure shall invalidate any rule or amendment adopted, or the rescission of any rule.

{¶ 26} "Rule" is defined as

> any rule, *regulation, or standard, having a general and uniform operation, adopted, promulgated, and enforced by any agency* under the authority of the laws governing such agency, and includes any appendix to a rule. "Rule" does not include any internal management rule of an agency unless the internal management rule affects private rights * * *.

(Emphasis added.) R.C. 119.01(C).

{¶ 27} The county contends that a TMDL is a rule for several reasons: (1) it sets the maximum amount of pollution that a particular water body can accommodate, (2) it elevates target values from a technical guidance document into de facto water-quality standards for the water body, and (3) it develops a second set of standards (consisting of the loading "allocation diet") required to achieve the new standard. The county asserts that when Ohio EPA applies this mandatory "diet" to numerous sources discharging into a specific water body or watershed, the TMDL is being applied just like any other rule.

{¶ 28} Ohio EPA counters that the TMDL is not a rule because (1) the TMDL's recommended discharge limits are not binding and do not impose any

legal duties, (2) TMDL reports are merely tools that assist Ohio EPA in fulfilling already existing legal obligations for improving water quality, and (3) the General Assembly did not intend for TMDLs to be developed as formal rules.

{¶ 29} We agree with the county. While it is true that guidelines for interpreting existing rules that do not substantively alter them are not subject to formal rulemaking, the TMDL is a "standard" that has "a general and uniform operation" within the meaning of R.C. 119.01(C). It does more than simply aid in the interpretation of existing rules or statutes. Instead, it prescribes a legal standard that did not previously exist. As such, it *must* first be formally promulgated as a rule pursuant to R.C. Chapter 119 before it can be enforced against the general public. *See, e.g., Ohio Nurses Assn.,* 44 Ohio St.3d 73, 540 N.E.2d 1354; *Jackson Cty. Environmental Commt. v. Schregardus,* 95 Ohio App.3d 527, 642 N.E.2d 1142 (10th Dist.1994) (holding that Ohio EPA cannot regulate through "guidelines" that are in reality rules requiring formal promulgation).

{¶ 30} While the TMDL at issue also has characteristics that are discharger-specific, i.e., not strictly uniform, the county's Tussing Road plant, as a point source, is but one of many affected by the TMDL. The TMDL applies to all current and future dischargers in the Big Walnut Creek watershed. The TMDL applies to a large segment of the public rather than a narrow group and is generally and uniformly applicable. Requiring Ohio EPA to undertake rulemaking procedures before applying the new standard set forth in the TMDL ensures that all stakeholders in the watershed have an opportunity to express their views on the wisdom of the proposal and to contest its legality if they so desire. *Northeast Ohio Regional Sewer Dist. v. Shank,* 58 Ohio St.3d 16, 24, 567 N.E.2d 993 (1991).

{¶ 31} Although Ohio EPA strongly maintains that a TMDL is simply a tool for implementing the agency's already existing legal obligations, this statement ignores the consequences of a TMDL. Once Ohio EPA establishes a TMDL, it must develop an implementation plan for the TMDL, and if applicable water-quality standards will not be immediately attained, the plan must include reasonable assurances that those standards will be attained in a reasonable period of time. Ohio Adm.Code 3745–2–12(A)(2) and (E). Additionally, for each established TMDL, pollutant loads allocated to point sources in a TMDL must be used to develop wasteload allocations for those point sources, and wasteload allocations determined as part of a TMDL shall be used to determine water-quality-based effluent limits[4] for that discharge. Ohio Adm.Code 3745–2–12(G) and (G)(4).

---

4. Water-quality-based effluent limits are the numeric limits imposed in discharge permits issued by Ohio EPA to point sources to ensure that applicable water-quality standards for a water body are achieved and maintained. *See* Ohio Adm.Code 3745–2–01 and 3745–2–02(B)(71).

These standards have general and uniform effect even though they will not be implemented against a point source until an NPDES permit is issued.

{¶ 32} A TMDL also creates new legal obligations. After determining the maximum capacity of a particular water body to assimilate the loadings of a specific pollutant, Ohio EPA sets a capacity ceiling that regulates the projected load of pollutant by each source. Ohio Adm.Code 3745-2-12(B) and (I). When developing the TMDL, Ohio EPA also establishes a margin of safety and a reserve for future growth in allocating pollutant loadings so that when the TMDL is finalized, a second cap also regulates the ability of dischargers to increase their loadings. Ohio Adm.Code 3745-2-12(J) and (K). When a water body is impaired for a pollutant contributed by both point and nonpoint sources, Ohio EPA divides the TMDL's total allocation allowed for that pollutant (minus the margin of safety and any reserve for future growth) among these sources. *See* Ohio Adm.Code 3745-2-12(F) and (G). The result of this process is the establishment of new, mandatory loading reductions arbitrarily divided among the sources along the stream. These regulatory outcomes exceed mere enforcement of compliance with existing authority.

*Rulemaking Is Consistent With the Position of Other Jurisdictions*

{¶ 33} The rule-like nature of TMDLs is also reflected in the fact that U.S. EPA must proceed through rulemaking when it establishes its own TMDLs. 33 U.S.C. 1313(d)(2); *see Telford Borough Auth. v. United States Environmental Protection Agency,* E.D.Pa. No. 2:12-CV-6548, 2013 WL 6047569, *2 (Nov. 15, 2013) ("If the EPA administrator disapproves of the state TMDL, the EPA may establish its own TMDL or revise the state TMDL *but must follow notice-and-comment rulemaking provisions of the Administrative Procedure Act ('APA') in doing so"* [emphasis added]).

{¶ 34} R.C. 6111.03(S)(2) also provides that R.C. Chapter 6111, Ohio's Water Pollution Control Act, "*shall* be administered, consistent with the laws of this state and federal law, in the same manner that the Federal Water Pollution Control Act is required to be administered." (Emphasis added.) Because U.S. EPA is compelled to undertake rulemaking when it develops a TMDL for a state water body, R.C. 6111.03(S)(2) reflects the General Assembly's intent that Ohio EPA do the same.

{¶ 35} Other state supreme courts that have addressed this issue have also ruled that TMDLs must be promulgated as rules before they are used as the basis for discharge limitations. *See Asarco, Inc. v. Idaho,* 138 Idaho 719, 69 P.3d 139 (2003) (holding that permit limits were invalid because the TMDL was not promulgated as a rule); *Commrs. of Pub. Works v. South Carolina Dept. of Health & Environmental Control,* 372 S.C. 351, 641 S.E.2d 763 (2007) (recogniz-

ing that the state was not authorized to rely on unpromulgated limits within a TMDL).

{¶ 36} The rulemaking requirements of R.C. Chapter 119 are mandatory protections against the arbitrary imposition of regulatory requirements. They are fundamental to the administrative process and apply broadly to any action by an agency that functions as a rule. In *Condee v. Lindley,* 12 Ohio St.3d 90, 465 N.E.2d 450 (1984), the tax commissioner argued that a long-standing allocation policy that applied to individual utilities was not subject to rulemaking because the policy fulfilled a statutory directive. We held that the policy was not exempt and that rulemaking was required to determine whether the tax commissioner's formula for allocating taxes was equitable and valid. "The rulemaking requirements set forth in R.C. Chapter 119 are designed to permit a full and fair analysis of the impact and validity of a proposed rule" before it is imposed upon the regulated community. *Id.* at 93.

*Water-Quality Standard for Phosphorus*

{¶ 37} As a secondary position, the county argues that the TMDL establishes a new water-quality standard for phosphorus that itself requires rulemaking. Ohio EPA acknowledges that water-quality standards must be adopted as rules. The statute governing Ohio EPA's authority over water quality provides:

> In furtherance of sections 6111.01 to 6111.08 of the Revised Code, the director of environmental protection shall adopt standards of water quality to be applicable to the waters of the state. *Such standards shall be adopted pursuant to a schedule established, and from time to time amended, by the director, to apply to the various waters of the state, in accordance with Chapter 119. of the Revised Code.*

(Emphasis added.) R.C. 6111.041. Thus, R.C. 6111.041 requires that Ohio EPA follow the rulemaking procedures of R.C. Chapter 119 when adopting or amending standards of water quality for waters of the state.

{¶ 38} The TMDL report notes that there are no statewide numeric water-quality criteria for phosphorus. *Id.* at 23. A current rule covering all water-body segments in the Scioto River drainage basin, including Blacklick Creek, sets forth three use designations for each segment: aquatic life habitat, water supply, and recreation. Ohio Adm.Code 3745–1–09. Under Ohio Adm.Code 3745–1–07, Table 7–11, Ohio EPA has already promulgated a narrative standard for phosphorus, stating that total phosphorus "shall be limited to the extent necessary to prevent nuisance growths of algae, weeds, and slimes that result in a violation of water quality criteria set forth in paragraph (E) of [Ohio Adm.Code] 3745–1–04 * * * or, for public water supplies, that result in taste or odor problems." But

the TMDL now at issue imposes numeric limits for the discharge of phosphorus into Blacklick Creek and other water bodies in the Big Walnut Creek watershed. The target value for phosphorus established in the TMDL report for all water bodies in the Big Walnut Creek watershed clearly constitutes a "standard of water quality" for "waters of the state of Ohio" within the meaning of R.C. 6111.041. Ohio EPA could not lawfully impose a phosphorus allocation for the county and other phosphorus sources in the watershed until that standard was first promulgated as a rule under R.C. Chapter 119.

*Ohio EPA Must Follow R.C. Chapter 119 Before Implementing a TMDL*

{¶ 39} In this case we hold that because a TMDL is a rule, Ohio EPA must engage in rulemaking under R.C. Chapter 119 before the TMDL may be used as the basis for an NPDES permit limit. Once those procedures have been completed and U.S. EPA approves the final TMDL, any attempt to challenge the TMDL before ERAC or in a court will be limited to issues that were not or could not have been raised during the rulemaking process.

{¶ 40} On appeal, the Tenth District ruled that Fairfield County had not demonstrated a due-process violation. The court dismissed the county's rulemaking argument and held that federal approval was sufficient, stating that "[t]he phosphorus limit in the NPDES permit came from the properly promulgated Big Walnut Creek TMDL." 2013-Ohio-2106, 2013 WL 2422905, ¶ 76. The court stated that this fact distinguished the instant case from *Jackson Cty. Environmental Commt. v. Schregardus*, 95 Ohio App.3d 527, 642 N.E.2d 1142, in which "unpromulgated guidelines were placed directly into a permit." *Id.* at 530. In *Schregardus*, the Tenth District determined that Ohio EPA's "Guidelines for Land Application of Paper Mill Sludge" met the statutory definition of "rule" because they had uniform and general application. Although the guidelines were limited to land application of sludge from one particular paper mill's operations, they were not directed solely at the application of such sludge by that company. Even if they were, the court "hesitate[d] to state that [they were] the types of guidelines which should be informally established by an agency when the applications may have far-reaching effects on the population at large, especially when that population is not given an opportunity to contest the guidelines through the formal procedures provided by R.C. Chapter 119." *Id.* at 530. The court concluded:

> By failing to rule-file the instant guidelines, the director has effectively denied interested members of the public a full and fair analysis of the impact and validity of the standards set forth therein and the effects on the public health and safety. Therefore, this court holds that the guidelines at issue in the present case which set standards for the "safe"

application of paper mill sludge containing dioxins under certain specific conditions are "rules" which should have been formally promulgated pursuant to R.C. Chapter 119.

*Id.*

{¶ 41} Here, the court of appeals incorrectly assumed that Ohio EPA did not need to comply with rulemaking procedures. U.S. EPA's approval of the TMDL for Big Walnut Creek watershed was not a "promulgation" of the TMDL as that process is described in R.C. 119.03. The only review of the TMDL was the review by U.S. EPA, and even that review does not include the underlying data from the TMDL development. 33 U.S.C. 1313(d) and (e). Because the TMDL did not undergo the rigors of rulemaking before being submitted to U.S. EPA, the stakeholders in the Big Walnut Creek watershed were denied meaningful review. The first time the county had an opportunity to challenge the TMDL was after U.S. EPA had approved it and after Ohio EPA had applied the standards to the county in the context of the NPDES permit.

{¶ 42} The TMDL for the Big Walnut Creek watershed will be used to impose new limits on numerous dischargers in 54 stream segments. Yet Ohio EPA failed to provide these dischargers, and the public generally, with the basic procedural protections provided by R.C. Chapter 119.

> Although due process is " 'flexible and calls for such procedural protections as the particular situation demands,' " *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893 [47 L.Ed.2d 18] (1976), quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593 [33 L.Ed.2d 484] (1972), the basic requirements of procedural due process are notice and an opportunity to be heard.

*State v. Hudson*, 2013-Ohio-647, 986 N.E.2d 1128, ¶ 48 (3d Dist.).

*Procedures Required by R.C. Chapter 119, the Ohio Administrative Procedure Act*

{¶ 43} To ensure adequate public participation, R.C. Chapter 119 requires, among other protections, public notice, the opportunity for public comment, and a public hearing before agency rules can be validly imposed. R.C. 119.03; *see Northeast Ohio Regional Sewer Dist.*, 58 Ohio St.3d at 24, 567 N.E.2d 993. "[F]ailure of any agency to comply with such procedure shall invalidate any rule or amendment adopted, or the rescission of any rule." R.C. 119.02. Ohio EPA points out that the public had an opportunity to comment on the draft TMDL before it was submitted. The draft of the TMDL report was made available for

public review from December 15, 2004, to January 21, 2005. A summary of comments received and the associated responses was submitted in the TMDL report, Appendix E. While this process did provide some opportunity for public input, it does not satisfy the requirements of R.C. Chapter 119.

{¶ 44} R.C. 119.03 sets forth the procedures required. These procedures are separate from the procedures for review and approval by U.S. EPA. The APA provides a detailed protocol for promulgating a proposed rule. That protocol, generally speaking, calls for public notice, which must include certain information, R.C. 119.03(A), electronic filing of the full text of the rule with certain public offices, R.C. 119.03(B), submission to the Joint Committee on Agency Rule Review for its scrutiny, R.C. 119.03(C), a full public hearing, R.C. 119.03(D), and much more. The purpose of these procedures is to provide opponents of a proposed regulation the opportunity to express their views as to the wisdom of the proposal and to present evidence with respect to its legality. *Northeast Ohio Regional Sewer Dist.* at 23–24.

{¶ 45} Without R.C. Chapter 119 procedures, there is no opportunity for a party to obtain meaningful review of a TMDL before the TMDL-derived limits are imposed in a permit. The abrogation of meaningful review of TMDL-based NPDES permit limits deprives NPDES permit holders of the right to notice and the opportunity to be heard provided by R.C. Chapter 119.

*R.C. Chapter 119 Must Be Followed Before Submission of the TMDL to U.S. EPA*

{¶ 46} In this case, the court of appeals recognized that ERAC is an administrative agency with special expertise and expressly accorded deference to ERAC's resolution of evidentiary conflicts. 2013-Ohio-2106, 2013 WL 2422905, ¶ 47. It is true that the county presented witnesses to challenge its permit limitations, but the appellate court held the federally approved TMDL to be invincible, relying on *Friends of the Earth, Inc. v. Environmental Protection Agency,* 446 F.3d 140 (D.C.Cir.2006), for the proposition that " '[o]nce approved by [U.S.] EPA, TMDLs must be incorporated into permits allocating effluent discharges among all pollution sources, including point sources * * * and non-point sources.' " *Id.* at ¶ 80, quoting *Friends* at 143. But the county's opportunity to present evidence challenging the TMDL before ERAC as part of the permitting phase is no substitute for the broader procedures afforded by R.C. Chapter 119, and this is especially true when the county's evidence is judged by a standard that makes the TMDL virtually irrebuttable.

{¶ 47} In the TMDL for Big Walnut Creek, Ohio EPA developed binding standards to apply to the entire watershed, and the discharging sources are expected to abide by those standards. But those who will be affected have not been provided with the full panoply of rights afforded by R.C. Chapter 119.

Without the benefit of the procedure prescribed by that chapter, affected persons are denied access to the process that the General Assembly intended them to have, i.e., the early, informed, and meaningful opportunity to challenge the legality of the standards established in the TMDL and the underlying assumptions, data, logic, and policy choices that Ohio EPA made in developing those standards.

{¶ 48} The only logical solution is to require that Ohio EPA's development of TMDLs adhere to the procedure required by R.C. Chapter 119. Any party to that procedure has a right to appeal to ERAC pursuant to R.C. 3745.04, and if such an appeal is taken, R.C. 3745.05 governs the hearing on appeal. The TMDL may be submitted to U.S. EPA for its approval only after this procedure has been completed, including any appeal. If U.S. EPA subsequently approves the final TMDL rule, ERAC and Ohio's courts can then lawfully restrict a later state-law challenge to the TMDL to those issues not inherent in the rulemaking, because a full opportunity to challenge will have already been provided through Ohio's statutory rulemaking procedures.

## V. Conclusion

{¶ 49} We hold that a TMDL established by Ohio EPA pursuant to the Clean Water Act is a rule that is subject to the requirements of R.C. Chapter 119, the Ohio Administrative Procedure Act. Ohio EPA must follow the rulemaking procedure in R.C. Chapter 119 before submitting a TMDL to U.S. EPA for its approval and before the TMDL may be implemented in an NPDES permit. We therefore affirm the judgment of the Tenth District, albeit for different reasons. The NPDES permit for Fairfield County's Tussing Road wastewater plant is vacated with respect to the unpromulgated phosphorus standard. This cause is remanded to Ohio EPA for proceedings consistent with this opinion.

Judgment affirmed.

O'CONNOR, C.J., and PFEIFER, FRENCH, and O'NEILL, JJ., concur.

O'DONNELL and KENNEDY, JJ., concur in judgment only.

———————

**O'DONNELL, J., concurring in judgment only.**

{¶ 50} This case presents only a limited question of whether an Ohio EPA report calculating the total maximum daily load ("TMDL") of phosphorus for Blacklick Creek and recommending technology based effluent limitations to be incorporated into the NPDES permit issued for Fairfield County's Tussing Road Waste Water Treatment Plant ("Tussing Road WWTP") is invalid because Ohio EPA failed to promulgate it in accordance with the R.C. Chapter 119 requirements for agency rulemaking. The majority concludes that the TMDL "pre-

scribes a legal standard that did not previously exist. As such, it *must* first be formally promulgated as a rule pursuant to R.C. Chapter 119 before it can be enforced against the general public." (Emphasis sic.) Majority opinion at ¶ 29.

{¶ 51} In my view, the TMDL only interprets the established water quality standards as applied to a particular permit holder on a specific segment of a river's tributary, and it therefore lacks the general and uniform operation required to characterize it as an administrative rule. Because the General Assembly never intended a TMDL to be promulgated through administrative rulemaking, I would reject Fairfield County's challenge to the validity of the TMDL.

{¶ 52} Today's majority decision is far-reaching in that Ohio EPA has issued 1,761 TMDLs for watercourses throughout Ohio, including 132 TMDLs for phosphorus alone. *See* U.S. Environmental Protection Agency, *Ohio Impaired Waters and TMDL Information,* available at http://iaspub.epa.gov/waters10/atta ins_state.report_control?p_state=OH&p_cycle=2008&p_report_type=T (accessed Mar. 12, 2015). None apparently have been promulgated through R.C. Chapter 119 rulemaking, and thus the majority's decision invalidates all of them, leaving the enforceability of numerous permits in question.

{¶ 53} Recent events have highlighted the challenges Ohio faces in protecting the waters of this state from pollutants that threaten the economy and endanger public health. Recently, a toxic algae bloom in Lake Erie, fed by high concentrations of phosphorus from rivers in the lake's watershed, contaminated Toledo's public water supply with hazardous levels of microcystin. *See* www.cleveland. com/outdoors/index.ssf/2014/08/toxic_algal_bloom_shuts_off_wa.html. And toxic algae blooms have caused authorities to issue advisories for Grand Lake St. Marys and Buckeye Lake. *See* www.dispatch.com/content/stories/local/2014/06/04/ Algae-warnings-issued-for-Buckeye-Lake.html. In my view, the majority's decision frustrates efforts to safeguard the state's surface water from these types of hazards by requiring any limit on the discharge of phosphorus in a particular NPDES permit to go through rulemaking and administrative appeal processes, forestalling a response to these conditions.

{¶ 54} Accordingly, I would affirm the judgment of the court of appeals but differ from the majority in that I would uphold the TMDL calculated by Ohio EPA and not require administrative rulemaking before incorporating its recommendations into a reissued NPDES permit.

### The Clean Water Act and Water Quality Standards

{¶ 55} Congress enacted the Clean Water Act with the objective "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. 1251(a). To meet this objective, the act provides for states to

promulgate water quality standards, which consist of "the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." 33 U.S.C. 1313(c)(2)(A). " ' "Uses" are the functions—such as recreation, irrigation, or provision of wildlife habitat—that the state has assigned a given body of water. "Criteria" are the technical judgments as to the specific pollution levels that are compatible with those uses.' " *Columbus & Franklin Cty. Metro. Park Dist. v. Shank*, 65 Ohio St.3d 86, 123, 600 N.E.2d 1042 (1992), quoting Pedersen, *Turning the Tide on Water Quality*, 15 Ecology L.Q. 69, 92–93 (1988). The criteria adopted by the state to protect the designated use may be established numerically or in a narrative form. 40 C.F.R. 131.11(b)(2).

{¶ 56} In R.C. 6111.041, the General Assembly delegated the duty to establish water quality standards to Ohio EPA, directing that agency to engage in administrative rulemaking pursuant to R.C. Chapter 119 in adopting them. The statute further requires Ohio EPA to "implement the standards so established in the issuance, revocation, modification, or denial of permits."

{¶ 57} The water quality standards are promulgated in Ohio Adm.Code Chapter 3745. These are established as numeric criteria for a variety of substances (such as certain chemicals and bacteria), providing a specific concentration of a pollutant that may be in a given volume of water but still achieve the water quality standard. *See generally* Ohio Adm.Code 3745–1–07. Other water quality standards have been promulgated using narrative criteria. Ohio Adm.Code 3745–1–04 establishes water quality criteria applicable to all surface waters of the state:

> To every extent practical and possible as determined by the director, these waters shall be:
>
> (A) Free from suspended solids or other substances that enter the waters as a result of human activity and that will settle to form putrescent or otherwise objectionable sludge deposits, or that will adversely affect aquatic life;
>
> (B) Free from floating debris, oil, scum and other floating materials entering the waters as a result of human activity in amounts sufficient to be unsightly or cause degradation;
>
> (C) Free from materials entering the waters as a result of human activity producing color, odor or other conditions in such a degree as to create a nuisance;
>
> (D) Free from substances entering the waters as a result of human activity in concentrations that are toxic or harmful to human, animal or aquatic life and/or are rapidly lethal in the mixing zone;

(E) Free from nutrients entering the waters as a result of human activity in concentrations that create nuisance growths of aquatic weeds and algae;

(F) Free from public health nuisances associated with raw or poorly treated sewage.

{¶ 58} Ohio EPA has not promulgated numeric criteria for phosphorus, but rather has provided that it "shall be limited to the extent necessary to prevent nuisance growths of algae, weeds, and slimes that result in a violation of the water quality criteria set forth in paragraph (E) of rule 3745–1–04 of the Administrative Code or, for public water supplies, that result in taste or odor problems." *Id.*, Table 7–11, fn. c. This standard is the basis for Ohio EPA's regulatory authority to limit the amount of phosphorus in waters of the state.

## TMDLs to Achieve Water Quality Standards

{¶ 59} Once a state establishes water quality standards, the Clean Water Act requires it to identify impaired waters and calculate the TMDL of a pollutant that may enter the water without causing a violation of the applicable standards. 33 U.S.C. 1313(d)(1)(A) and (C). In contrast to the water quality standards, the General Assembly has not expressly required a TMDL to be promulgated as an administrative rule, even though it provided other requirements for the development of TMDLs. *See, e.g.,* R.C. 6111.12(D)(2), 6111.52(E), 6111.56(A) and (B). This is so because a TMDL does not represent a policy preference of Ohio EPA or a new water quality standard, but rather provides the factual and technological data, derived from observation and application of scientific principles, needed for Ohio EPA to implement the water quality standard.

{¶ 60} The first step in establishing a TMDL is to establish a numeric target to "serve as a measure of comparison between observed instream conditions and conditions that are expected to restore the designated uses of the waterbody." Ohio EPA, Division of Surface Water, *Total Maximum Daily Loads for the Big Walnut Creek Watershed* 23 (Aug. 19, 2005) ("the TMDL report"), available, minus appendices, at http://www.epa.state.oh.us/portals/35/tmdl/BWC_Final% 20 081505.pdf (accessed Mar. 12, 2015). That is, Ohio EPA needs to know the maximum amount of phosphorus that a watercourse can contain without violating the water quality standard—here, the specific concentration that, if exceeded, will cause nuisance growths of aquatic weeds and algae. Ohio EPA has not promulgated statewide numeric criteria for phosphorus by administrative rule—i.e., through a standard having a general and uniform operation throughout the state regardless of local conditions—and therefore relied on the results of a study called *Association Between Nutrients, Habitat, and the Aquatic Biota in Ohio*

*Rivers and Streams,* Ohio EPA Technical Bulletin MAS/1999–1–1 (Jan. 7, 1999), available at www.epa.state.oh.us/portals/35/lakeerie/ptaskforce/AssocLoad.pdf (accessed Mar. 12, 2015). That study analyzed the effects of nutrients, including phosphorus, on the aquatic biological communities of Ohio streams and rivers.

{¶ 61} According to the TMDL report, the *Association* study found that 0.11 mg/l of total phosphorus is the numeric target for wadeable streams and rivers in the Eastern Corn Belt Plains ecoregion of Ohio, which includes Blacklick Creek. That value, representing the concentration of phosphorus that rivers and streams in the watershed can assimilate naturally without causing impairment, is derived from observation and scientific modeling that can be tested and verified. Fairfield County asserts that the data and methodology used in the *Association* study to generate the numeric target are flawed, but that only underscores the point that the numeric target resulted from a case-by-case examination of local conditions, not from a policy choice. As the TMDL report expressly acknowledges, "these nutrient targets are not codified in Ohio's water quality standards; therefore, there is a certain degree of flexibility as to how they can be used in a TMDL setting." *Id.* at 24. Thus, the numeric target is not a legal standard, but an objective, factual determination.

{¶ 62} Ohio Adm.Code 3745–2–12(B) requires Ohio EPA to calculate the TMDL as the sum of all existing or projected loads of a pollutant (such as phosphorus) from all point sources (direct dischargers such as the Tussing Road WWTP), nonpoint sources (indirect discharges such as runoff and failing home sewer systems), and naturally occurring background sources that can be allowed and still attain the water quality standard. These calculations showed that the water quality standard as quantified by the numeric target could not be achieved without a 62 percent reduction in phosphorus from all sources on Blacklick Creek. TMDL report at 74.

{¶ 63} The TMDL report proposes a strategy to achieve the 62 percent reduction by calculating wasteload allocations (i.e., the amount allowed to be discharged by point sources through NPDES permits) and load allocations (i.e., the amount of pollutant that comes from nonpoint sources and natural causes). The TMDL in this case recommended an 81 percent reduction in the load coming from nonpoint sources along Blacklick Creek, concluding that these reductions would be "manageable * * * although still challenging."

{¶ 64} In addition, the TMDL report recommended *increasing* the wasteload allocation given to point sources by 54 percent over existing loads. For example, it suggested allowing the Tussing Road WWTP to increase its discharge of total phosphorus from an existing load of 3,047 lb/year to 4,569 lb/year, based on the recognition that Fairfield County is growing rapidly and will need to discharge more effluent into Blacklick Creek in the coming years.

{¶ 65} But to offset this increased wasteload, the TMDL report recommended imposing a technology-based phosphorus limit of 0.5 mg/l for Fairfield County's Tussing Road WWTP—the single largest point source discharger of phosphorus in the Big Walnut Creek watershed. It proposed similar limits for three other facilities and a 1.0 mg/l limit for three significantly smaller facilities in the watershed. These limits represent the concentration of phosphorus that remains in a point source's discharges after implementing a specific treatment technology, and Tony Vogel, Fairfield County's Director of Utilities, admitted that it was possible for the county to implement these new treatment technologies to comply with the 0.5 mg/l limit, although it would cost $5 million.

{¶ 66} Contrary to the majority's assertion, the wasteload allocations for point sources in the watershed are not "arbitrarily divided" by the TMDL report. Majority opinion at ¶ 32. Rather, Ohio EPA calculated the wasteload allocation for the Tussing Road WWTP by multiplying the maximum discharge capacity of the facility (the design flow of three million gallons a day) by 0.5 mg/l—the concentration of phosphorus remaining in the discharge after the use of existing treatment technology—and determined that the facility may discharge a maximum of 4,569 pounds of phosphorus per year.

### A TMDL Is Not an Administrative Rule

{¶ 67} Based on these facts, it is my view that neither the TMDL in general nor the specific technology based effluent limitation and wasteload allocation that Fairfield County challenges in this case can be fairly characterized as agency rules that must be adopted through administrative rulemaking pursuant to R.C. Chapter 119.

{¶ 68} A "rule" is defined by R.C. 119.01(C) as "any rule, regulation, or standard, *having a general and uniform operation,* adopted, promulgated, and enforced by any agency under the authority of the laws governing such agency, and includes any appendix to a rule." (Emphasis added.) As this court indicated in *State ex rel. Saunders v. Indus. Comm.,* 101 Ohio St.3d 125, 2004-Ohio-339, 802 N.E.2d 650, "The pivotal issue in determining the effect of a document is whether it enlarges the scope of the rule or statute from which it derives rather than simply interprets it. * * * If the former, it must be promulgated pursuant to R.C. Chapter 119. If the latter, it is exempt from those requirements." *Id.* at ¶ 27.

{¶ 69} The numeric target for phosphorus provided in the TMDL report represents only an application of the water quality standard promulgated by Ohio Adm.Code 3745–1–04(E) to a particular segment of a watershed, in which Ohio EPA has calculated the specific concentration of phosphorus that rivers and streams in the Big Walnut Creek Watershed can assimilate before it contributes to nuisance growths of aquatic weeds and algae that impair the water. Thus, the

numeric target differs from the statewide numeric criteria promulgated as rules in Ohio Adm.Code 3745–1–07 that provide set numerical limits for specific substances (such as arsenic and mercury) applicable to *all* surface water, notwithstanding the unique local characteristics of the water body that affect how those substances are assimilated.

{¶ 70} The 0.5 mg/l technology based limit and the corresponding wasteload allocation imposed on the Tussing Road WWTP do set a ceiling on the amount of phosphorus the facility can discharge. However, R.C. 6111.042 expressly permits Ohio EPA to "establish on a case-by-case basis effluent limitations in a permit issued under section 6111.03 of the Revised Code, based upon best professional judgment," when effluent limitations adopted by the United States EPA are not applicable. Here, the United States EPA has not adopted an effluent limit for phosphorus, Ohio EPA expressly justified the 0.5 mg/l technology based limit on the exercise of its best professional judgment, and the statute permits imposing that limit on a case-by-case basis. Nothing in this statute requires the agency to promulgate a rule before exercising this authority.

{¶ 71} Our decision in *Condee v. Lindley,* 12 Ohio St.3d 90, 465 N.E.2d 450 (1984), on which the majority relies, actually supports the view that the technology based effluent limitation at issue here need not be promulgated as an administrative rule in order to be enforceable. That case concerned the question of "whether the Tax Commissioner's policy (allocating thirty percent of situsable property value to the non-situsable property value category when compiling and issuing certificates of tax valuation on public utility property) is an improperly adopted rule and therefore invalid." *Id.* at 91. We concluded that the policy should have been promulgated as a rule, noting that "the commissioner's policy herein was *adopted in lieu of a case-by-case analysis* of each taxpayer's liability." (Emphasis added.) *Id.* at 93. But in contrast, the technology based effluent limit imposed on the Tussing Road WWTP has been applied only on a case-by-case basis, and even the majority concedes that these limits are "discharger-specific, i.e., not strictly uniform." Majority opinion at ¶ 30.

{¶ 72} The majority also mistakenly concludes that "[i]n the TMDL for Big Walnut Creek, Ohio EPA developed binding standards to apply to the entire watershed * * *." Majority opinion at ¶ 47. The TMDL report itself characterizes the 0.11 mg/l numeric target as uncodified and flexible, and it calls the effluent limits "recommendations." Notably, when Ohio EPA initially drafted Fairfield County's NPDES permit, it did not apply the 0.5 mg/l limit for phosphorus for the first 15 months of the permit period. And when Fairfield County objected to the new limit, Ohio EPA eliminated the phosphorus limit for the first three years of the permit's term and provided an interim limit of 1.0 mg/l

through the remainder of the permit. Fairfield County has continued to follow these permit conditions during the eight and one half years since it commenced this appeal. The permit limits therefore do not represent a mechanical application of the wasteload allocation proposed in the TMDL; Ohio EPA could—and in fact did—permit the Tussing Road WWTP to exceed the limits recommended in the TMDL report.

{¶ 73} The majority further claims that "[t]he rule-like nature. of TMDLs is also reflected in the fact that U.S. EPA must proceed through rulemaking when it establishes its own TMDLs." Majority opinion at ¶ 33. Its reliance on 33 U.S.C. 1313(d)(2) as directly supporting this statement is misplaced, because nothing in that section requires notice and comment rulemaking, and the lone citation to a single federal trial court case refers to dicta only. More fundamentally, however, 33 U.S.C. 1313(d)(2) requires United States EPA to establish a TMDL for a state "not later than thirty days" after it disapproves the state's TMDL, but the federal Administrative Procedure Act generally requires "publication or service of a substantive rule shall be made not less than 30 days before its effective date * * *." 5 U.S.C. 553(d). Given the short time span provided for establishing a TMDL, it does not appear that Congress ever intended the agency to engage in full-scale notice and comment rulemaking.

{¶ 74} In the last analysis, the TMDL report's recommendations directly affect only seven permit holders throughout a watershed that drains 556.7 square miles, while the wasteload allocation applies only to the Tussing Road WWTP. These are hardly standards having a general and uniform operation, and the majority's conclusion that the TMDL affects "a large segment of the public rather than a narrow group" is not borne out by the facts of this case. Majority opinion at ¶ 30. And far from being binding, it does not appear that the TMDL report's recommendations for the Tussing Road WWTP have ever been applied—and they may never apply, given that the appellate court had remanded the permit to Ohio EPA to consider evidence relating to the technical feasibility and economic reasonableness of the 0.5 mg/l technology based effluent limit pursuant to R.C. 6111.03(J)(3). 2013-Ohio-2106, 2013 WL 2422905, ¶ 147–149, 160.

{¶ 75} Accordingly, in my view, the Tenth District Court of Appeals properly concluded that the TMDL at issue here is not a rule or standard that may be adopted only through administrative rulemaking, and because Ohio EPA has not challenged the appellate court's determination that the agency failed to consider the technical feasibility and economic reasonableness of the 0.5 mg/l technology based limit prior to imposing it in the most recent permit, I would affirm the judgment of the court of appeals on the basis that the TMDL's recommended effluent limitations did not require administrative rulemaking.

KENNEDY, J., concurs in the foregoing opinion.

Frost Brown Todd, L.L.C., Stephen P. Samuels, Joseph M. Reidy, Stephen N. Haughey, and Thaddeus H. Driscoll, for appellant.

Michael DeWine, Attorney General, Eric E. Murphy, State Solicitor, Samuel C. Peterson, Deputy Solicitor, and L. Scott Helkowski and Alana R. Shockey, Assistant Attorneys General, for appellee.

Linda S. Woggon, urging reversal for amicus curiae Ohio Chamber of Commerce.

John Gotherman; and Frost Brown Todd, L.L.C., Stephen H. Haughey, Thaddeus H. Driscoll, and Stephen J. Smith, urging reversal for amici curiae Ohio Municipal League and County Sanitary Engineers Association of Ohio.

Squire Sanders, L.L.P., Jessica E. DeMonte, Andrew Etter, and John D. Lazzaretti, urging reversal for amici curiae Association of Ohio Metropolitan Wastewater Agencies and National Association of Clean Water Agencies.