[Cite as *Khemsara v. Ohio Veterinary Med. Licensing Bd.*, 2023-Ohio-718.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

BHARAT K. KHEMSARA, DVM.,  :

　　Plaintiff-Appellant,  :　　　　　No. 111845

　　v.  :

OHIO VETERINARY MEDICAL  :
LICENSING BOARD,

　　Defendant-Appellee.  :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 9, 2023

---

Administrative Appeal from the Cuyahoga County Common Pleas Court
Case No. CV-21-953348

---

*Appearances:*

Kubyn & Ghaster and R. Russell Kubyn, *for appellant.*

David Yost, Ohio Attorney General, and Caroline E. Mills,
Assistant Attorney General, *for appellee.*

EILEEN A. GALLAGHER, J.:

{¶ 1}　Appellant Bharat Khemsara appeals from a decision of the Cuyahoga County Court of Common Pleas affirming an adjudication order issued by appellee the Ohio Veterinary Medical Licensing Board (the "Board") that revoked Khemsara's license to practice veterinary medicine. Khemsara claims that the

common pleas court erred and abused its discretion in affirming the Board's adjudication order because (1) he was denied due process due to a lack of proper notice of alleged licensure violations and the Board's "sham proceedings" and (2) the Board's decision to revoke his veterinary license was "unconstitutional, illegal, arbitrary, capricious, unreasonable and unsupported by the preponderance of substantial, reliable, and probative evidence." For the reasons that follow, we affirm the common pleas court.

**Procedural and Factual Background**

{¶ 2} Khemsara became a veterinarian in 1965 and was first licensed to practice veterinary medicine in the state of Ohio in 1977. During the time period at issue, he operated a veterinary clinic, the Euclid Veterinary Clinic, in Euclid, Ohio.

{¶ 3} The Board is charged with regulating the practice of veterinary medicine in Ohio. *See* R.C. Chapter 4741. The Board has the authority to initiate disciplinary action against a licensee who violates the provisions of R.C. 4741.22(A), including the rules of the Board and professional standards governing the proper methods to be used in the care and treatment of animals. R.C. 4741.22(A)(1).

{¶ 4} In early March 2021, the Board received a complaint from Barbara Petras regarding the care Khemsara had provided to her cat, Blago, when the cat was experiencing "breathing distress." Petras alleged that Khemsara had misdiagnosed and mistreated her cat, ultimately resulting in the cat's death. Specifically, Petras alleged:

My cat, 6 year old male tabby, BLAGO, was brought to the vet clinic (Khemsara) on 2/24/21,[1] Saturday[,] by my son, Brenton Petras. The cat was exhibiting breathing distress. Cat was given an [x]-ray and dx with pneumonia by Khemsara. Was given Clavamox (2 boxes) and Disal water pills as going home treatment. Cat was given medications in the office, and bill was $544. The next day the cat was not improving. My son took the cat back on the following Monday. Charge was $59 for a shot to make the cat eat. Was told it will take time. Cat still worsened. Office was called next day. Told to bring in cat for treatment next day for same shot. Was told by the office staff to decide to spend money or decide not to. Cat was given a breathing treatment with albuterol. And office staff sent home breathing machine. Cat still not eating or drinking. I, Barbara, was giving the cat subQ fluids on my own to keep the cat alive. Cat not eating or drinking for 5 days. Called office again to complain about worsened condition and was told to get a second opinion. Went to Dr. Philip Price in Eastlake OH on Thursday 2/25/21. Told needed x[-]ray. I declined [x-]ray and told Dr. Price to get [x-]ray from Dr. Khemsara. Dr. Khemsara did not answer phone during work hours on that Thursday, 2/25/2002. Cat was treated with shot from Dr. Price and [a]ntibiotic. Cat worsened. Friday took cat back for [x-]ray and [c]at died on [x-]ray table. Was told cat had cardiomyopathy clearly seen on [x-]ray taken. I called Dr. Khemsara multiple times on Friday to get [x-]ray over to Dr. Price before the [a]ppointment. Khemsara delayed critical care to my cat, by #1 having no outgoing greeting on the answering machine and not answering his phone with urgent requests, and not responding timely to the [x-]ray medical release to Dr. Price. My cat could not lay on it's [sic] side because it was filled with fluid. Dr. Khemsara misdiagnosed my animal and caused immense pain and suffering to my animal as well as myself and my son as we tried to save our beloved animal.

{¶ 5} On March 5, 2021, the Board's executive director, Theresa Stir ("Stir"), sent letters to Khemsara and Price notifying them of the complaint and requesting that they submit copies of Blago's medical records and a signed narrative

---

[1] Although Petras' complaint indicates that her son first brought Blago to Khemsara's clinic for treatment on Saturday, February 24, 2021, February 24, 2021 was a Wednesday, not a Saturday. Khemsara's records indicate that Petras' son brought Blago in for treatment on Saturday, February 20, 2021.

of events to the Board. Khemsara and Price submitted documents, including copies of x-rays, in response to the Board's request.[2]

{¶ 6} The medical records Khemsara submitted documented two visits to his office on February 20 and February 22, 2021. According to the medical records, on February 20, 2021, Blago "presented at the clinic for inappetence," was dehydrated and "heart sounds" could not be heard "due to fluid build-up." A radiograph was performed; "images of heart and lungs [were] unclear due to excessive fluid in the thoracic cavity." A "[p]roblems [l]ist" identified two conditions: (1) respiratory infection and (2) "[c]ongestive heart failure; prognosis: poor." The records further reflect that Khemsara administered Midazolam (after which Blago was able to eat when offered food), a B-12 liver injection, Lasix and Zimeta and prescribed Clavamox, Prednisone and Cyproheptadine.

{¶ 7} According to the medical records submitted by Khemsara, Blago was back at the clinic two days later because he had "returned to not eating." The records reflect that Blago was dehydrated, that "heart sounds" could not be heard "due to fluid build-up" and that a blood test and heart medication had been recommended but that the "owner refused." A "[p]roblems [l]ist" identified two conditions: (1) respiratory infection and (2) "[a]dvanced CHF; prognosis: poor." The records reflect that Khemsara administered Midazolam, Ampicillin, Lasix and Albuterol to Blago and "[s]ent home breathing machine with [o]wner."

_____

[2] The record reflects that, in response to the Board's request, Khemsara submitted medical records and that Price submitted a narrative and medical records.

{¶ 8} The medical records Price submitted documented two visits to his office on February 25 and February 26, 2021. In the narrative he provided, he stated:

> After discussion it seemed as though the owner was satisfied with the diagnosis and treatment provided at Euclid. I had suggested further lab work including x-rays and routine blood work to clarify the situation as 5 days had gone by. The owner didn't want to do any lab work and seemed to be wishing that I pick up treatment where Euclid left off. It seemed that they were having a communication issue with Euclid. I had little to go by and I certainly couldn't render a second opinion.

{¶ 9} Price indicated that a physical examination of the cat on February 25, 2021 revealed that the cat was "dyspnic and had a sub normal temperature," which led Price to conclude that the cat was either "in critical terminal condition losing temperature or * * * had responded to the [C]lav[a]mox and [L]asix" provided by Khemsara. Price stated that he administered a higher dose of Lasix and an antibiotic, Baytril, but "stressed the need for some diagnostics as a guide to further treatment."

{¶ 10} The medical records reflect that Petras' son returned with Blago the following day and asked "which lab work might be the most meaningful." Price indicated that "[g]iven the choice," he chose x-rays over bloodwork and that Blago died as he was being x-rayed, likely due to respiratory failure.

{¶ 11} Price related that he called Khemsara's clinic several times on February 25 and 26, 2021 in an attempt to obtain or discuss the prior x-ray that had been taken, but received no response until after the cat had died. He indicated that

the x-ray Khemsara had taken "appeared similar to mine but the condition was a bit less progressed"; "[m]ore open lung was visible on their x-ray with lots of pulmonary edema." Price stated that he "suspected" Blago had cardiomyopathy but that he could not "confirm a specific diagnosis" because a necropsy was not performed.

{¶ 12} On April 20, 2021, following a review of the documents submitted, the Board issued a Notice of Opportunity for Hearing to Khemsara (the "notice" or "notice of opportunity for hearing"). The notice charged Khemsara with violations of R.C. 4741.22(A)(1) and Ohio Adm.Code 4741-1-10 for providing veterinary medical care that fell below the minimum standards of veterinary care and resulted in the death of Petras' cat as follows:

> a. You documented fluid in the chest but did not take action to treat;
>
> b. You were unable to hear heart sounds indicating that the prognosis was poor. However, you did not offer any alternative treatments or a referral to a specialist or a more equipped veterinary facility.

{¶ 13} The notice also indicated that this was Khemsara's seventh disciplinary case before the Board. The notice listed each of the prior disciplinary actions that had been taken against Khemsara "for standard of care and/or medical records violations."

{¶ 14} In response to the notice, Khemsara requested a hearing. An administrative hearing was held on September 8, 2021. Khemsara was represented

by counsel at the hearing. Stir, Kimberly Riker-Brown, D.V.M., and Khemsara testified at the hearing.[3]

{¶ 15} Stir, a registered nurse and attorney in good standing in the state of Ohio, stated that she had been the Board's executive director for 15 years. She described the allegations Petras had made against Khemsara as set forth in her complaint, explained the investigation that had been conducted of those allegations, identified the documents in the Board's file and testified regarding service of required notices on Khemsara.

{¶ 16} Stir then proceeded to describe (1) the condition of the cat and Khemsara's diagnoses and treatment as documented in the medical records Khemsara provided to the Board, i.e., which she described as treating the cat for "[l]ikely pneumonia or some such thing like that," and (2) the condition of the cat and Price's treatment and diagnoses as reflected in the medical records and narrative Price provided to the Board, i.e., which she described as diagnosing the cat with "suspected cardiomyopathy."

{¶ 17} Stir testified that, based on the medical records submitted to the Board, the cat was brought in to Khemsara due to concerns of "inappetence, not having an appetite or eating." She indicated that a radiograph was performed which

---

[3] In addition to the witness testimony, the notice of opportunity for hearing, Khemsara's request for hearing, notices related to the scheduling of the hearing, the Board's case file (including Petras' complaint, correspondence to Petras regarding her complaint, the Board's letters to Khemsara and Price, the medical records received from Khemsara and Price and the narrative received from Price), documents evidencing the prior disciplinary actions against Khemsara and a narrative produced by Khemsara on the date of the hearing were admitted into evidence at the hearing.

showed that the cat's heart and lungs were unclear due to excessive fluid in the thoracic cavity. When asked whether that "[w]ould * * * signal or flag any kind of a medical condition," Stir responded: "Well, there's all kinds of things that it could lead to. I mean, you would think pneumonia or — but when — congestive heart failure or — but when there's — you need to have a clear picture to make an accurate diagnosis."

{¶ 18} As to whether "any other additional diagnostics * * * should have been considered" at that time, Stir stated, based on her "background as a nurse" and her "experience as the executive director for the board," "Lab work should have been done as well I would think. I don't know. Maybe a specialist probably because clearly there was something going on that they couldn't diagnose because of the fluid." Stir stated that she was not familiar with at least two of the medications Khemsara had prescribed for Blago.

{¶ 19} Over Khemsara's objection, although Stir admitted that she was "not familiar with, you know, animal care," and had no education in veterinary medicine or treating animals, the Board permitted Stir to offer her opinion regarding the standard of care provided by Khemsara:

> Q. What types of things could have — what other types of alternatives * * * would have been available to treat that condition to the extent that you're aware?
>
> A. They could have intubated the cat. They could have done other things, especially with the diagnostics. I would have probably at least gotten blood work to see what other medications would have been more compatible.

Q.     And kind of the same question for any of the treatment or testing done regarding the difficulty hearing the heartbeat, what types of things could have been considered to address that condition?

A.     I probably would have sent it — referred it on to somebody who could have done either an office visit, ultrasound or gotten a clearer [x]-ray.

Q.     Is there any documentation in the medical record that any of those alternatives were discussed with the client or presented at all?

A.     No.

Q.     Okay.  Based on the information contained in the medical chart, the records and the test results, and your experience as a nurse and as the executive director of the veterinary board for 15 years, and the test results for Barbara Petras's cat, have you reached an opinion to a reasonable degree of medical certainty as to whether the standard of care used when treating Ms. Petras's cat departed from the minimal standards of care of similar veterinarians under similar circumstances?

A.     I don't believe that it rose to the minimal standards of care.

Q.     And what is that opinion based on?

A.     Based on that they — I don't believe that this veterinarian was capable of treating the animal adequately.

{¶ 20} When asked whether the treatment of cardiomyopathy would be the same or different from the treatment of pneumonia, Stir responded, "It would most likely be different," but she could not "expand" or "explain" her response even "a little bit" when asked to do so.

{¶ 21} Stir also testified regarding Khemsara's disciplinary history and identified various documents that documented that history[4] as follows:

- Adjudication Order (dated August 24, 2004) for Case File #03-03-072 — Violations of R.C. 4741.22(A) and O.A.C. 4741-1-03(A) and (B)(6)(a) for "not properly reading the blood work for 'Harley' and making an improper diagnosis, having expired drugs in his pharmacy, not mainting [sic] proper controlled substance logs and not having a lock box for your controlled substances" — One month suspension with 15 days suspended, a $250 fine and payment of $780 in costs.

- Adjudication Order (dated May 10, 2007) for Case File #05-06-127 — Violations of R.C. 4741.22(A) and (AA) and Ohio Adm.Code 4741-1-03(A) and 4741-1-21(I) for failure to "adequately communicate the complications during surgery of the spay of 'Mandy' to the owners or to the veterinarian who would be releasing the dog to the owners" and deficient treatment records regarding the complications during the surgery — Two-week suspension and submission of 10 surgical records that "meet the Board's satisfaction."

- Settlement Agreement (dated January 2011) for Case File #10-10-026 — Involving alleged violations of R.C. 4741.22(Y) and Ohio Adm.Code 4741-1-21(A) — Payment of investigative costs of $430, completion of a course on recordkeeping and submission of five surgical records following completion of the recordkeeping course.

- Settlement Agreement (dated March 2015) for Case File #14-15-113 — Involving alleged violations of R.C. 4741.22(A) and (Y) and Ohio Adm.Code 4741-1-10 and 4741-1-21 — Payment of $2000 fine and completion of four continuing education courses on medical records, radiology, oncology and physical examinations.

- Settlement Agreement (dated March 2019) for Case File #18-19-127 — Involving alleged violations of R.C. 4741.22(A)(25) and Ohio Adm.Code 4741-1-21 — Payment of $1000, completion of a continuing education course on medical records and submission

---

[4] Khemsara stipulated to the admissibility of these documents.

of 10 medical records that comply with Ohio Adm.Code 4741-1-21 to the board quarterly for one year.

- Adjudication Order (dated April 15, 2021) for Case File #18-19-127 & 20-20-036 — Violations of R.C. 4741.22(A)(18) and (25) and Ohio Adm.Code 4741-1-21 for performing veterinary medicine while under suspension and for failure to document physical examination findings or site of vaccine injection in medical records — 30-day suspension, payment of $1000 fine and cost of the hearing and a written reprimand.

{¶ 22} On cross-examination, Stir testified that she had not spoken with Petras or Price regarding the treatment of Blago or the allegations against Khemsara. She stated that neither Petras nor Price had been subpoenaed to testify at the hearing. Stir could not say whether Price disagreed with the treatment Khemsara provided Blago and acknowledged that Price had stated that when Blago was brought into his office for treatment, Blago's "[p]rognosis was guarded at best or grave for any long term survival." Stir further acknowledged that, according to Khemsara's notes, Petras had refused a recommended blood test for Blago but stated that she did not know why Petras had refused the test because Khemsara did not document the reason for her refusal. Stir indicated, however, that an individual's finances should not impact the standard of care that is owed a patient.

{¶ 23} Riker-Brown, a veterinarian, a Board member and an associate partner at Shoreland Animal Hospital in Toledo, Ohio, also testified at the hearing. Khemsara objected to Riker-Brown's testimony based on (1) her position as a Board member, (2) the lack of notice to Khemsara that she would be testifying, (3) the Board's failure to provide an expert report for her testimony and (4) the lack of

separation of witnesses. The Board chair overruled Khemsara's objections on the grounds that (1) Riker-Brown had the same credentials as Khemsara and was simply a veterinarian providing her opinion to "fellow veterinarian[s]," (2) Riker-Brown had recused herself from participating in the proceedings, including from deliberating and voting on the matter, due to her role as a witness in the case and (3) Khemsara had not requested separation of witnesses. Riker-Brown testified that the other Board members knew and understood, prior to the commencement of the hearing, that she would be testifying as a witness in the case and would not be participating in the hearing as a Board member. Three of the five remaining Board members (who participated in the hearing as Board members) were veterinarians, one was a veterinary technician and one was a member of the public.

{¶ 24} Riker-Brown testified that she had been certified to practice veterinary medicine in the state of Ohio since 2003, that she had been working at Shoreland Animal Hospital for 18 years and that she had previously worked at two other small animal hospitals in Toledo and a mixed animal practice in Oregon. Riker-Brown indicated that she regularly reviews medical charts, records and test results of patients that she has not seen in person and that review and reliance upon medical records is an accepted practice within the veterinary medical community.

{¶ 25} Riker-Brown stated that she first learned that she would be testifying at the hearing that morning and that, based on her ten-minute review of the medical records and test results for Blago, she had developed an opinion "within a reasonable degree of veterinary certainty as to whether the standard of care used

when treating [Petras'] cat departed from the minimal standards of care of similar veterinarians under similar circumstances." She testified that, in her opinion, Khemsara's treatment of Blago "fell below the standard of care," i.e., that "the cat was not treated to the standard of care of veterinary medicine * * * in 2021."

{¶ 26} Riker-Brown explained that it could be "clearly seen" from the radiograph taken by Khemsara on February 20, 2021 that the cat had cardiomegaly (an enlarged heart) and pulmonary edema (fluid in the interstitial space in the lungs). She stated that Zimeta, which Khemsara had administered to Blago on February 20, 2021, "is only labeled * * * to treat fevers" in horses and dogs, is "not labeled in cats" and causes "irreversible bone marrow suppression in cats." She indicated that Khemsara took only a single radiograph in diagnosing Blago (when "at least two or three views" in different positions were needed "to accurately get a diagnosis and accurately treat a [cat] that's in respiratory distress") and that he had failed to run blood work to look for "[a]nything that caused respiratory distress." In addition, Riker-Brown noted that Prednisone, one of the medications Khemsara prescribed to treat Blago, is "contraindicated in pneumonia and cardiac disease" because it "is an anti-inflammatory," "suppresses the immune system" and "makes the heart function poorly." She further indicated that the Lasix Khemsara had administered to Blago at the clinic to address the fluid in the cat's lungs was insufficient because Lasix has a "very short" half-life and that additional Lasix should have been sent home with Blago to provide continued relief.

{¶ 27} With respect to the treatment Khemsara provided when Blago was "not eating again" on February 22, 2021, Riker-Brown stated that Khemsara administered an additional Lasix injection and Albuterol, which is used to treat asthma, not pneumonia or cardiac heart failure. She testified that a follow-up x-ray should have been taken and blood work done; however, she noted that Khemsara had recommended blood work and the owner had refused. She stated that, in her view, additional Lasix should have, again, been sent home with Blago to provide continued relief, that Blago should have also been given oxygen therapy and that Blago should have been referred to a specialist because "the cat was decompensating more than what Dr. Khemsara could provide treatment for." Riker Brown testified that a specialist could have offered a cardiac ultrasound, which could have revealed why Blago was experiencing congestive heart failure or an enlarged heart, and offered heart medication or other treatments to help the heart function better.

{¶ 28} On cross-examination, Riker-Brown acknowledged that she had not spoken to Petras, Khemsara or Price in developing her opinion that Khemsara had violated the minimum standard of care. She stated that, even though Blago had passed away in Price's care, in her opinion, Price's care did not fall below the standard of care. She explained: "The cat died in his care because it was so decompensated because it wasn't treated appropriately the first two times it was seen * * *. So Dr. Price didn't have a chance to treat the cat."

{¶ 29} Riker-Brown stated that if Khemsara had made additional recommendations to the owner, they should have been reflected in Blago's medical

records.  She indicated that, in her opinion, a client's finances do not impact the standard of care that is owed to them and that she would present the same plan of care for all clients, regardless of their finances.

{¶ 30} Khemsara testified that he operated a "small animal clinic" in Euclid, Ohio, that it was a walk-in clinic that did not make appointments and that most of his clients were "poor people."  Khemsara stated that he remembered Petras, that she had not previously been at the clinic and that she brought the cat in when the "[p]rognosis was very poor," "[g]one too far."

{¶ 31} Khemsara testified that, on February 20, 2021, Petras brought in her eight-year-old cat, complaining of inappetence.  He stated that, during the physical exam of the cat, heart sounds were not clearly heard, so he performed an x-ray, and the radiograph confirmed a fluid build-up in the thoracic cavity.  He indicated that he informed Petras that the cat had congestive heart failure and that the prognosis was very poor.  He said that he gave the cat "some shots" and an IV, after which the cat began eating.  He stated that he gave the cat Lasix, B-12, a liver injection and a Zimeta intramuscular injection.

{¶ 32} Khemsara testified that Petras came back with her cat two days later, complaining of inappetence and a nonproductive cough.  He stated that he then asked Petras "how much [she was] willing to pay for treating her 8-years-old cat?"  He indicated that Petras responded that she was going to treat the cat herself and "come back after two days."  He stated that Petras never returned to the clinic and, instead, went to Price.  When asked why he did not perform more than one x-ray,

Khemsara responded: "For diagnosing X-ray why you need three X-rays? People don't want to pay money. Took minimum care to do the job." Khemsara also stated that he had offered to do bloodwork, but that Petras had declined it. With respect to why he did not refer Petras to a specialist, Khemsara at first testified that "she didn't come back so I could send her to a specialist or what." Later, he testified that he told Petras "the first time" she came to the clinic, "We told her we couldn't — prognosis very poor. Go to some other place. Go to specialist," but that "[s]he didn't want to spend money." Khemsara stated that Price did not do anything different than he would have done and that he did not believe anything could have been done to save Blago.

{¶ 33} At the hearing, Khemsara produced a narrative that had not been previously provided to the Board. He testified that the narrative had been created a "few weeks" earlier and was typed up by his "help," i.e., a girl at his clinic, whose name he could not remember and who was not in the room when he treated Blago. Khemsara stated that everything contained in the narrative was "correct and true."

{¶ 34} After Khemsara's direct examination, the Board chair, who was also a veterinarian, noted that veterinarians are taught to obtain at least two views when performing an x-ray to confirm a diagnosis or to get a closer diagnosis and questioned Khemsara why the failure to do so in this case was not a violation of the standard of care. She also asked Khemsara (1) why it was not a violation of the standard of care to prescribe Prednisone (which she indicated could cause a cat to go into acute congestive heart failure) to a cat with known or suspected congestive

heart failure, "especially without documenting it to the owner," (2) why the cat was treated with Albuterol, which is expensive and stressful for the cat, when there was no diagnosis of asthma and (3) why if Khemsara had referred Petras elsewhere for further treatment or recommended that the cat return for a recheck, as he had claimed, no notes to that effect were included in the medical records.

{¶ 35} Khemsara did not have a meaningful response to any of the chair's inquiries. With respect to the Prednisone, Khemsara stated that the cat "had a lung problem too" and that with "[p]neumonia, you have to give steroid, too." The chair disputed this and stated that "[s]teriods were contraindicated." With respect to the Albuterol, Khemsara stated that it would help "[a] little bit for this condition, but not help one hundred percent, but the cat not eating." The chair disputed that Albuterol would help with the cat's eating issues. When asked whether it had occurred to him that the cat was not eating because it could not breathe well, Khemsara replied, "No."

{¶ 36} Following the hearing, the Board went into a deliberative session. After deliberating, the Board voted to revoke Khemsara's license. The chair explained the Board's decision as follows:

> [W]e have come to the finding of revoking the license of Dr. Bharat Khemsara for standard of care violation as alleged on this notice 21-21-030 for inappropriate therapy based on the differential diagnosis and the poor prognosis that contributed to the demise of the cat, and also in discussion and deliberation taking into consideration the multiple violations since 2003 and apparent lack of learning and recordkeeping and so forth, and we find it in the public's best interest that we pursue revocation.

{¶ 37} On September 9, 2021, the Board issued a written adjudication order revoking Khemsara's veterinary license, stating that the Board found that the charges against Khemsara had been proven and that the Board had voted to revoke Khemsara's license to practice veterinary medicine for the following reasons:

1.   The board found that Dr. Khemsara provided inappropriate medical therapy in face of the differential diagnosis and the poor prognosis which contributed to the demise of the cat.

2.   The [b]oard also took into consideration the multitude of previous violations and disciplinary actions against Dr. Khemsara.

{¶ 38} Khemsara filed an administrative appeal of the Board's decision with the Cuyahoga County Court of Common Pleas. On July 26, 2022, the common pleas court affirmed the Board's decision, concluding that the Board's decision did not violate Khemsara's due process rights, was supported by reliable, probative and substantial evidence and was in accordance with the law.

{¶ 39} Khemsara appealed to this court, raising the following two assignments of error for review:

1.   The lower appellate court erred to the prejudice of the Appellant and abused its discretion by affirming the Appellee's revocation of the Appellant's license to practice veterinary medicine based upon the Appellee's failure to provide adequate, proper, and effective notice of the alleged licensure violations, depriving the Appellant of the constitutional right to due process of law, and conducting sham proceedings.

2.   The lower appellate court erred to the prejudice of the Appellant and abused its discretion by affirming the Appellee's revocation of the Appellant's license to practice veterinary medicine as such was unconstitutional, illegal, arbitrary, capricious,

unreasonable, and unsupported by the preponderance of substantial, reliable, and probative evidence.

## Law and Analysis

### Standard of Review

{¶ 40} The standard of review for an appeal to common pleas court from an administrative order revoking a license is contained in R.C. 119.12(M). *Capital Care Network of Toledo v. Ohio Dept. of Health*, 153 Ohio St.3d 362, 2018-Ohio-440, 106 N.E.3d 1209, ¶ 24. In an administrative appeal under R.C. 119.12, a common pleas court may affirm an administrative order "if it finds, upon consideration of the entire record and any additional evidence the court has admitted, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law." R.C. 119.12(M); *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621, 614 N.E.2d 748 (1993). R.C. 119.12(M) requires a reviewing common pleas court to conduct two inquiries: (1) a hybrid factual/legal inquiry and (2) a purely legal inquiry. As to the hybrid inquiry, i.e., whether the administrative order is supported by reliable, probative, and substantial evidence:

> "[T]he common pleas court must give deference to the agency's resolution of evidentiary conflicts, but 'the findings of the agency are by no means conclusive.' * * * 'Where the court, in its appraisal of the evidence, determines that there exist legally significant reasons for discrediting certain evidence relied upon by the administrative body, and necessary to its determination, the court may reverse, vacate, or modify the administrative order.'" *Ohio Historical Soc. v. State Emp. Relations Bd.*, 66 Ohio St.3d 466, 470-471, 613 N.E.2d 591 (1993), quoting *Univ. of Cincinnati v. Conrad*, 63 Ohio St.2d 108, 111, 407 N.E.2d 1265 (1980). * * * "[A]n agency's findings of fact are presumed to be correct and must be deferred to by a reviewing court unless that court determines that the agency's findings are internally inconsistent,

impeached by evidence of a prior inconsistent statement, rest upon improper inferences, or are otherwise unsupportable." *Ohio Historical Soc.*, 66 Ohio St.3d at 471, 613 N.E.2d 591; *VFW Post 8586 v. Ohio Liquor Control Comm.*, 83 Ohio St.3d 79, 81, 697 N.E.2d 655 (1998).

*Bartchy v. State Bd. of Edn.*, 120 Ohio St.3d 205, 2008-Ohio-4826, 897 N.E.2d 1096, ¶ 37; *Buckeye Relief, L.L.C. v. State Bd. of Pharm.*, 2020-Ohio-4916, 160 N.E.3d 767, ¶ 17 (8th Dist.); *see also Capital Care Network* at ¶ 25 (An administrative appeal to the common pleas court "does not provide a trial de novo"; "where the agency's decision is supported by sufficient evidence and the law, the common pleas court lacks authority to review the agency's exercise of discretion, even if its decision is 'admittedly harsh.'"), quoting *Henry's Cafe, Inc. v. Bd. of Liquor Control*, 170 Ohio St. 233, 236-237, 163 N.E.2d 678 (1959).

{¶ 41} "Reliable" evidence is "'dependable'" evidence that "can be confidently trusted," i.e., "'there must be a reasonable probability that the evidence is true.'" *Bartchy* at ¶ 39, quoting *Our Place, Inc. v. Ohio Liquor Control Comm.*, 63 Ohio St.3d 570, 571, 589 N.E.2d 1303 (1992). "Probative" evidence is "'evidence that tends to prove the issue in question; it must be relevant in determining the issue.'" *Bartchy* at ¶ 39, quoting *Our Place* at 571. Evidence is "substantial" if "it has some weight, importance, and value." *Buckeye Relief* at ¶ 17, citing *Bartchy* at ¶ 39.

{¶ 42} As to the whether the administrative order is "in accordance with the law," the common pleas court conducts a de novo review. *Buckeye Relief* at ¶ 17 ("With respect to the purely legal inquiry, while the reviewing [common pleas] court

must defer to the agency's findings of facts, it 'must construe the law on its own.'"),
quoting *Bartchy* at ¶ 38.

{¶ 43} Our role in reviewing the judgment of the common pleas court in such a case is further constrained. We review the common pleas court's decision regarding the evidentiary basis for the administrative order, i.e., whether the administrative order is supported by reliable, probative and substantial evidence, for abuse of discretion. *Pons*, 66 Ohio St.3d at 621, 614 N.E.2d 748; *Buckeye Relief* at ¶ 19. With respect to purely legal questions, such as the construction of a statute or constitutional provision, we conduct a de novo review. *McClendon v. Ohio Dept. of Edn.*, 2017-Ohio-187, 77 N.E.3d 523, ¶ 9 (8th Dist.); *see also Harrison v. Ohio Veterinary Med. Licensing Bd.*, 10th Dist. Franklin No. 08AP-408, 2008-Ohio-6519, ¶ 7 ("[A]n appellate court does have plenary review of purely legal questions in an administrative appeal."). Thus, only if the common pleas court abused its discretion or committed legal error, may the court of appeals may reverse, vacate or modify the judgment of the common pleas court.

{¶ 44} A court abuses its discretion where its decision is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). Abuse of discretion is "a very high standard." *Supportive Solutions Training Academy, L.L.C., v. Electronic Classroom of Tomorrow*, 8th Dist. Cuyahoga Nos. 95022 and 95287, 2013-Ohio-3910, ¶ 11. As the Ohio Supreme Court explained in *Pons*:

> While it is incumbent on the [common pleas] court to examine the evidence, this is not a function of the appellate court. The appellate court is to determine only if the [common pleas] court has abused its discretion, i.e., being not merely an error of judgment, but perversity of will, passion, prejudice, partiality, or moral delinquency. Absent an abuse of discretion on the part of the [common pleas] court, a court of appeals may not substitute its judgment for those of the * * * board or a [common pleas] court. Instead, the appellate court must affirm the [common pleas] court's judgment.

*Pons* at 621.

{¶ 45} Following a careful review of the record in this case, Khemsara has not shown that the common pleas court erred or abused its discretion in affirming the Board's revocation of Khemsara's license to practice veterinary medicine.

**Due Process and in Accordance with the Law**

{¶ 46} In his first assignment of error, Khemsara challenges the common pleas court's determination that "the administrative proceeding did not violate [his] due process rights."

{¶ 47} The Fourteenth Amendment to the United States Constitution and Ohio Constitution, Article I, Section 16, require that administrative proceedings comport with due process. *Edmands v. State Med. Bd. of Ohio*, 10th Dist. Franklin No. 14AP-778, 2015-Ohio-2658, ¶ 23, citing *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), and *Doyle v. Ohio Bur. of Motor Vehicles*, 51 Ohio St.3d 46, 554 N.E.2d 97 (1990). "'Although due process is flexible and calls for such procedural protections as the particular situation demands, the basic requirements of procedural due process are notice and an opportunity to be heard.'" (Citations omitted.) *Edmands* at ¶ 23, quoting *Fairfield Cty. Bd. of Commrs. v. Nally*, 143

Ohio St.3d 93, 2015-Ohio-991, 34 N.E.3d 873, ¶ 42. Procedural due process requires administrative agencies to give fair notice of the precise nature of the charges at issue. *Griffin v. State Med. Bd.*, 10th Dist. Franklin No. 11AP-174, 2011-Ohio-6089, ¶ 22. "In addition, the right to a hearing includes the right to appear at the hearing prepared to defend oneself through testimony, evidence, or argument against the charges brought." *Bennett v. Ohio Dept. of Edn.*, 4th Dist. Scioto No. 21CA3948, 2022-Ohio-1747, ¶ 39.

{¶ 48} Khemsara contends that he was denied due process because (1) the notice of opportunity for hearing issued by the Board "violated [his] rights" and did not comply with R.C. 119.07 and (2) the Board's "sham proceedings" "eliminated [his] opportunity to defend against the alleged licensure violations." Khemsara's contentions are meritless.

{¶ 49} R.C. 119.07 states, in relevant part:

> Except when a statute prescribes a notice and the persons to whom it shall be given, in all cases in which section 119.06 of the Revised Code requires an agency to afford an opportunity for a hearing prior to the issuance of an order, the agency shall give notice to the party informing the party of the party's right to a hearing. Notice shall be given by registered mail, return receipt requested, and shall include the charges or other reasons for the proposed action, the law or rule directly involved, and a statement informing the party that the party is entitled to a hearing if the party requests it within thirty days of the time of mailing the notice. The notice shall also inform the party that at the hearing the party may appear in person, by the party's attorney, or by such other representative as is permitted to practice before the agency, or may present the party's position, arguments, or contentions in writing and that at the hearing the party may present evidence and examine witnesses appearing for and against the party. A copy of the notice shall be mailed to attorneys or other representatives of record representing the party.

Khemsara does not explain how or why he contends the notice of opportunity for hearing in this case did not meet the requirements of R.C. 119.07 or otherwise "violated [his] rights." For that reason alone, we could disregard his argument. "'If an argument exists that can support [an] assigned error, it is not this court's duty to root it out.'" *Strauss v. Strauss*, 8th Dist. Cuyahoga No. 95377, 2011-Ohio-3831, ¶ 2, quoting *Cardone v. Cardone*, 9th Dist. Summit Nos. 18349 and 18673, 1998 Ohio App. LEXIS 2028, 22 (May 6, 1998); *see also Rodriguez v. Rodriguez*, 8th Dist. Cuyahoga No. 91412, 2009-Ohio-3456, ¶ 7 ("[I]t is not the duty of an appellate court to search the record for evidence to support an appellant's argument as to any alleged error."); App.R. 12(A)(2).

{¶ 50} However, even if we were to consider the issue, the record reflects that Khemsara was properly served with the notice, that the content of the notice complied with R.C. 119.07 and that Khemsara had a reasonable opportunity to be heard regarding the charges against him.

{¶ 51} The notice of opportunity for hearing specifically listed "the charges or other reasons for the proposed action" — i.e., the complaint received from Petras regarding the veterinary medical care provided to her cat, the Board's review of the medical records provided by Khemsara, its determination that Khemsara's medical care fell below the minimum standards of veterinary care because he "documented fluid in the [cat's] chest but did not take action to treat" and he was "unable to hear heart sounds indicating that the prognosis was poor" but "did not offer any

alternative treatments or a referral to a specialist or a more equipped veterinary facility" and the prior disciplinary actions taken against Khemsara, each of which was specifically listed. The notice identified the specific laws and rule involved, i.e., R.C. 4741.22(A)(1) and Ohio Adm.Code 4741-1-10, and the notice informed Khemsara that (1) he was entitled to a hearing if requested within thirty days; (2) at the hearing, he could appear in person, by his attorney, or by such other representative as the Board may permit to appear for him (or he could present his position, arguments, or contentions in writing) and (3) at the hearing, he could present evidence and examine witnesses appearing for and against him.

{¶ 52} Khemsara also contends that he was denied due process because (1) "all of the members were biased, partial and prejudiced against [him] to such a great degree that [it] adversely and negatively affected the [Board's] 'decision' to revoke [Khemsara's] license," (2) the Board "refused to allow certain questions [and] procedural clarifications" at the hearing, (3) he was not provided a list of witnesses in advance of the hearing, (4) Petras and Price were not subpoenaed to testify at the hearing, (5) Riker-Brown was a Board member, not an "independent 'expert' witness," and (6) Riker-Brown did not provide an expert report. Once again, Khemsara's arguments are unavailing.

{¶ 53} First, Khemsara has not shown that any of the Board members were biased, partial or prejudiced against him. Although Khemsara asserts that one Board member "stated on the Record that the board had made a decision prior to the evidentiary hearing to revoke [Khemsara's] license," he includes no citation to

the record supporting this claim. Accordingly, we disregard it. App.R. 12(A)(2) ("The court may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based * * * as required under App. R. 16(A)."); App.R. 16(A)(7) ("The appellant shall include in its brief * * * [a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies.").

{¶ 54} Likewise, Khemsara has not shown that he was denied due process because the Board "refused to allow certain questions [and] procedural clarifications" at the hearing. In his appellate brief, Khemsara does not identify the specific "questions" he was allegedly precluded from asking or "clarifications" he was allegedly precluded from seeking and does not explain how, if at all, the Board's "refus[al]" to allow such questions or clarifications adversely impacted the decision in this case. R.C. 119.09 states that, at a R.C. 119.12 hearing:

> The agency shall pass upon the admissibility of evidence, but a party may at the time make objection to the rulings of the agency thereon, and if the agency refuses to admit evidence, the party offering the same shall make a proffer thereof, and such proffer shall be made a part of the record of such hearing.

Khemsara made no such proffer in this case.

{¶ 55} The rules of civil procedure, including its discovery provisions, do not apply in administrative proceedings. *See, e.g., Bennett*, 2022-Ohio-1747, at ¶ 40 ("An administrative board meets 'its duty as to "discovery" by supplying [a licensee]

with sufficient information enabling him [or her] to properly respond to the charges.'"), quoting *Carratola v. Ohio State Dental Bd.*, 9th Dist. Summit No. 18658, 1998 Ohio App. LEXIS 2020, 11-12 (May 6, 1998); *Miccichi v. Ohio State Dental Bd.*, 5th Dist. Tuscarawas No. 86AP-080063, 1987 Ohio App. LEXIS 6740, 6-7 (May 4, 1987). Pursuant to R.C. 119.09, a party to an administrative hearing may request that the administrative board or agency issue a subpoena to compel the attendance of a witness at the hearing.

{¶ 56} Riker-Brown recused herself and was not participating in the proceedings as a voting member of the Board at the time she testified at the administrative hearing. Khemsara never requested a list of witnesses nor did he request that the Board subpoena Petras or Price to testify at the hearing. Accordingly, the Board was not required to provide a list of witnesses or to subpoena Petras or Price to testify at the hearing. *See, e.g., Walters v. Ohio State Dept. of Admin. Servs.*, 10th Dist. Franklin No. 06AP-472, 2006-Ohio-6739, ¶ 29 ("Pursuant to R.C. 119.09, if requested by a party to the adjudicatory hearing, an administrative agency must issue a subpoena to compel the attendance of a witness."); *Miccichi* at 6 ("[I]t was not error for the Board to refuse to furnish a list of witnesses. In a normal judicial action, an adverse party would be required to furnish a list of potential witnesses. * * * This principle did not apply to the administrative hearing since the Rules of Civil Procedure do not apply in an agency hearing."); *see also Bingham v. Ohio Veterinary Med. Licensing Bd.*, 9th Dist. Summit No. 18510, 1998 Ohio App. LEXIS 532, 17-20 (Feb. 11, 1998) (rejecting argument that right to a fair and

impartial hearing was violated because board was exposed to evidence during investigation that was not subject to cross-examination); *Westlake v. Ohio Dept. of Agriculture*, 10th Dist. Franklin Nos. 08AP-71 and 08AP-72, 2008-Ohio-4422, ¶ 19 ("[A]dministrative agencies are, generally, not bound by the strict rules of evidence applied in court. * * * Thus, hearsay is not precluded in administrative hearings. * * * [H]earsay evidence may be considered in administrative proceedings where the statement is not inherently unreliable and constitutes substantial, reliable, and probative evidence.").

{¶ 57} Further, the Board was not required to provide an expert report or to present "independent" expert testimony establishing Khemsara's violation of the standard of care. As Khemsara acknowledges in his appellate brief, (Br. at 14), the Board was not required to present expert testimony to support its charges against Khemsara. *See, e.g., Lies v. Ohio Veterinary Med. Bd.*, 2 Ohio App.3d 204, 211-212, 441 N.E.2d 584 (1st Dist.) (expert testimony about reasonable standards of veterinary practice not mandatory in disciplinary proceedings before the state veterinary medical board). The purpose of expert testimony is generally to assist a factfinder in understanding issues that require scientific or specialized knowledge or experience beyond common knowledge and experience. The majority of the Board here were veterinarians. As such, they possessed the specialized knowledge necessary to determine the standard of veterinary medical care and were able to rely on their own knowledge and experience in determining whether Khemsara's conduct fell below that minimum standard of care. *See, e.g., In re Griffith,* 66 Ohio

App.3d 658, 663-664, 585 N.E.2d 937 (10th Dist.); *cf. Pons*, 66 Ohio St.3d at 623, 614 N.E.2d 748, citing *In re Williams*, 60 Ohio St.3d 85, 87, 573 N.E.2d 638 (1991), and *Arlen v. State*, 61 Ohio St.2d 168, 173, 399 N.E.2d 1251 (1980).

{¶ 58} In this case, the record reflects that the Board provided sufficient information to Khemsara to enable him to effectively and meaningfully respond to the charges presented against him. As detailed above, the Board served Khemsara with a notice of opportunity for hearing that apprised him of the charges against him, his right to an administrative hearing and his right to have an attorney represent him at that hearing. Khemsara retained and was represented by counsel throughout the administrative process. The record reflects that all the documentary evidence the Board and its witnesses reviewed and relied upon related to the charges against Khemsara was made available to Khemsara prior to the hearing. The Board provided Khemsara with copies of its case file, including Petras' complaint and the medical records and narrative it had received from Price. At the hearing, Khemsara had the opportunity to offer witness testimony and other evidence on his behalf, to make arguments on his behalf, to testify on his behalf and to cross-examine the witnesses presented by the Board.

{¶ 59} Based on the record before us, Khemsara has not shown that the common pleas court erred in determining that his due process rights were not violated. Khemsara's first assignment of error is overruled.

**Determination that Reliable, Probative and Substantial Evidence Supports the Board's Decision**

{¶ 60} In his second assignment of error, Khemsara argues that the common pleas court erred and abused its discretion in determining that the Board's decision to revoke Khemsara's license to practice veterinary medicine was supported by "reliable, probative and substantial evidence."

{¶ 61} R.C. 4741.22(A)(1) states, in relevant part:

The state veterinary medical licensing board may * * * revoke the license * * * of * * * any person holding a license * * * to practice veterinary medicine * * * who * * * [i]n the conduct of the person's practice does not conform to the rules of the board or the standards of the profession governing proper, humane, sanitary, and hygienic methods to be used in the care and treatment of animals.

{¶ 62} Ohio Adm.Code 4741-1-10 states:

The board shall, pursuant to section 4741.22 of the Revised Code and to the extent permitted by law, take action against the license of any veterinarian or the registration of a veterinary technician for a departure from, or the failure to conform to, minimal standards of care of similar practitioners under the same or similar circumstances, whether or not actual injury to the patient is established.

{¶ 63} The Board revoked Khemsara's license to practice veterinary medicine because it found that Khemsara had provided "inappropriate medical therapy in face of the differential diagnosis and the poor prognosis which contributed to the demise of the cat" and due to the "multitude of previous violations and disciplinary action" against Khemsara.

{¶ 64} The common pleas court, finding reliable, probative and substantial evidence existed in the record to support the Board's decision, upheld the Board's adjudication order.

{¶ 65} Khemsara argues that the Board's decision was not supported by reliable, probative and substantial evidence and that the common pleas court, therefore, erred and abused its discretion in affirming the Board's adjudication order because: (1) Khemsara provides an "important service to the community[,] including a walk-in clinic * * * that helps lower income individuals and their pets," which was ignored by the Board and the common pleas court; (2) Stir lacked the expertise to opine regarding the standard of care owed by Khemsara, had never personally spoken with Khemsara, Petras or Price and did not have "first-hand personal knowledge of the presentation, examination, diagnosis, and treatment of the cat" and (3) the common pleas court "improperly focused" on certain aspects of Stir's and Riker-Brown's testimony regarding what Khemsara did or should have done differently in treating Blago.

{¶ 66} Although we agree that Stir, a nurse and attorney who had no education or training in veterinary medicine, lacked the expertise to render a proper expert opinion regarding the standard of care Khemsara provided to Blago, her testimony was not the only evidence presented at the hearing.

{¶ 67} As detailed above, Blago's medical records, the testimony of Riker-Brown, Khemsara's testimony (including his responses to questions by the Board chair as she sought to clarify why Khemsara made certain choices and failed to make

others when seeking to diagnose and treat Blago) and the evidence of prior disciplinary action for medical records violations, standard of care violations and practicing while under suspension also supported the common pleas court's determination that reliable, probative and substantial evidence existed in the record to support the Board's adjudication order.

{¶ 68} Based on the record before us, we cannot say that common pleas court acted arbitrarily, unreasonably or unconscionably or otherwise erred in affirming the Board's decision to revoke Khemsara's license to practice veterinary medicine. The common pleas court's decision affirming the Board's adjudication order was detailed and well-reasoned. It is not our role to weigh the evidence or to substitute our judgment for that of the Board and/or the common pleas court. *Harrison v. Ohio Veterinary Med. Licensing Bd.*, 10th Dist. Franklin No. 08AP-848, 2009-Ohio-2856, ¶ 15, citing *Pons*, 66 Ohio St.3d at 621, 614 N.E.2d 748. Khemsara's second assignment of error is overruled.

{¶ 69} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

ANITA LASTER MAYS, A.J., and
MARY J. BOYLE, J., CONCUR